**ANDERSON & KARRENBERG**
Thomas R. Karrenberg (#3726)
Stephen P. Horvat (#6249)
700 Chase Tower
50 West Broadway
Salt Lake City, Utah 84101-2035
Telephone:  (801) 534-1700
Facsimile: (801) 364-7697

**CHRISTENSEN & JENSEN**
George W. Burbidge, II (#6503)
50 South Main Street, #1500
Salt Lake City, Utah  84144
Telephone:  (801) 323-5000
Facsimile:  (801) 355-3472

**Attorneys for Defendant**

---

# UNITED STATES DISTRICT COURT

## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| STEWART TITLE GUARANTY COMPANY, a Texas corporation, | **MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| v. | |
| METRO NATIONAL TITLE, a Utah corporation; and DOES 1 through 10, | Case No. 2:04CV01191 DS |
| Defendants. | Judge David Sam |

Defendant Metro National Title ("Metro") submits this Memorandum in Opposition to

Plaintiff Stewart Title Guaranty Company's ("Stewart's") Motion for Summary Judgment.

## PRELIMINARY STATEMENT

Stewart asks the Court to order Metro to indemnify Stewart for various claims, to the tune of more than $850,000, primarily under a contractual provision making Metro liable to Stewart for losses caused by Metro's "negligence, fraud, or intentional act or omission."  Yet Stewart does not even attempt to show that Metro was actually guilty of any negligence, fraud, or other intentional acts or omissions.  Further, the only evidence Stewart has submitted to support its damages claims is unsupported and unsubstantiated declaration testimony stating simply the total amount Stewart purports to have spent to settle a number of claims.  Stewart has not even bothered to explain why it made those payments, how those payments relate to Metro's actions or inactions under the Metro-Stewart contract, or, most importantly, whether it was *reasonable* for Stewart to make such payments.  Well-established principles of indemnity law expressly hold that such a showing is insufficient to support a judgment against a would-be indemnitor; to prevail on an indemnity claim, the indemnitee must show that the amounts it paid were reasonable.  Further, the Metro-Stewart contract limits Metro's liability to losses incurred "under a title policy" and caused by Metro's negligence.  Thus, Stewart must show how much of its losses were incurred under Metro-issued title policies, and how much of its losses were caused by Metro's negligence versus the negligence of Stewart itself or third parties.  Stewart does not even acknowledge these responsibilities.

Similarly, over $300,000 of Stewart's claim consists of attorney fees supposedly paid in connection with various claims, but Stewart has not bothered to submit invoices, reports, or,

indeed, *any* evidence to support the basis or reasonableness of the fees.  Instead, Stewart merely asserts the amount it supposedly paid in connection with each particular claim.  That's it.

Notably, Stewart settled the claims at issue without involving Metro in the settlement decisions or even letting Metro know that Stewart would be holding Metro ultimately liable for each claim; yet Stewart is now claiming that Metro is liable for every dollar Stewart chose to spend, without any explanation for what the money was spent on.  Stewart's position is breathtaking in its arrogance as well as in its disregard for fundamental principles of law and equity.

Stewart's motion is nowhere near sufficient to compel entry of judgment against Metro. Further, genuine issue of material fact exist on almost every issue.  Accordingly, Stewart's motion should be denied in its entirety.

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ...................................................................i

**TABLE OF CONTENTS** .....................................................................iii

**TABLE OF AUTHORITIES** ................................................................vii

**RESPONSES TO STATEMENT OF UNDISPUTED FACTS**................................ x

**STATEMENT OF ADDITIONAL MATERIAL FACTS**....................................xliv

      A.    The Underwriting Agreement ..........................................xliv

      B.    Stewart Never Coordinates with the Agent in the Defense or
             Settlement of a Claim by an Insured.....................................xlv

      C.    Stewart's Loss Policies ................................................xlvi

      D.    The Arnold Industries Claim. .......................................xlvii

      E.    The Dean Clark Claim. ...................................................li

**SUMMARY OF ARGUMENT** ..............................................................1

**ARGUMENT** ................................................................................4

**I.**      **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED
          TO JUDGMENT AS A MATTER OF LAW ON THE ARNOLD
          INDUSTRIES CLAIMS (Fifth Cause of Action)**........................4

      A.    Stewart has not established that Metro must indemnify Stewart
             for anything more than $2500, because Stewart has not shown
             that it has suffered losses as a result of Metro's "negligence,
             fraud, or intentional act or omission"..................................6

            1.    The Underwriting Agreement limits Metro's indemnification
                  liability to $2500 for losses "not due to [Metro's] negligence." ...............6

2.     Stewart has not established as a matter of law that Metro was negligent or committed fraud or another intentional act. ......................... 13

B.     Stewart has not established that Metro was obligated to indemnify Stewart for the amounts Stewart claims to have paid as a result of the Arnold claim. ................................................................................. 16

1.     Stewart has not established that Metro is liable for the $450,300 Stewart paid to Arnold. ........................................................... 16

a.     Stewart has not shown that Stewart was actually liable to Arnold for this amount or that the settlement was reasonable. ................................................................. 16

b.     Stewart has not shown that the entire $450,300 constituted a "loss under the policy" that was "due to" Metro's negligence. ................................................................. 24

i.     There is at least an issue of fact as to how much of the $450,300 was a "loss under the policy." ...... 25

ii.     There is an issue of fact as to how much of the $450,300 Stewart incurred due to Metro's negligence, fraud, or other intentional act. .................... 28

2.     Stewart has not established that Metro is liable for the $287,132.61 Stewart purportedly incurred in attorney fees. ................... 33

a.     Stewart has not established the basis, necessity, or reasonableness of the claimed fees. .............................................. 33

b.     There is a disputed issue of fact as to whether the claimed fees were incurred in "loss adjustment." ....................... 35

c.     There is a disputed issue of fact as to whether all of the claimed fees were incurred "due to [Metro's] negligence, fraud, or intentional act or omission." ..................... 36

C.     Stewart's claim is barred by estoppel .................................................. 37

**II.**   **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE FAR WEST BANK CLAIM  (First Cause of Action)** .................................................................. 39

**III.**   **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE RUBBER BALL PRODUCTIONS CLAIM  (Second Cause of Action)** .................................. 39

**IV.**   **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE HOLLOW POINTE CLAIM  (Third Cause of Action)** .................................................................. 40

**V.**   **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE FIRST WESTERN NATIONAL BANK CLAIM  (Fourth Cause of Action)** ...................... 41

    A.   Stewart has not established as a matter of law that Metro was negligent ................................................................................................. 41

    B.   Stewart has not established the basis or reasonableness of the fees it is seeking ...................................................................................... 41

    C.   Stewart has not established that the fees were "due to" Metro's alleged negligence .................................................................................. 42

**VI.**   **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE DRAPER LAND LIMITED PARTNERSHIP CLAIM  (Sixth Cause of Action)** ................................ 42

    A.   Stewart has not established that Metro was negligent. ........................................ 42

    B   Stewart has not established that the settlement was reasonable. ........................ 43

    C.   Stewart's claim is barred by the doctrines of waiver, estoppel, payment, and accord and satisfaction, because Stewart accepted payment in full for the claim. ................................................................. 43

**VII.**   **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE DEAN CLARK CLAIM (Seventh Cause of Action)** .............................................................. 44

    A.   Stewart has not established that Metro was negligent.. ........................................ 44

B       Stewart has not established that Stewart was actually liable on the claim under the Clark policy and that the settlement was reasonable. . ......................................................................................... 45

C.      Stewart has not established that the entire $92,000 Stewart incurred in connection with the Clark/Intermountain Mortgage claim was "due to" Metro's negligence............................................................ 53

**CONCLUSION** ..................................................................................................... 54

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

Albion-Idaho Land Co. v. Naf Irr. Co., 97 F.2d 439 (10th Cir. 1938) ....................................13

Allied Hotels Co. v. H & J Constr. Co., 376 F.2d 1 (10th Cir. 1967) ......................................12

Ammerman v. Farmers Ins. Exch., 430 P.2d 578 (Utah 1967)................................................26

Arnold Indus. v. Love, 63 P.3d 721 (Utah 2002) .................................................5, 13, 14, 15, 32

Atkin Wright & Miles v. Mountain States Telephone & Telegraph,
709 P.2d 330 (Utah 1985).........................................................................................27

Atlantic Richfield Co. v. Interstate Oil Transport Co., 784 F.2d 106 (2d Cir. 1986)..............21

Beck v. Farmers Ins. Exch., 701 P.2d 795 (Utah 1985) ......................................................26

Burlington Northern R. Co. v. Stone Container Corp., 934 P.2d 902
(Colo. App. 1997) ...............................................................................................22, 27

Campbell v. State Farm Mut. Auto Ins. Co., 840 P.2d 130 (Utah App. 1992)........................26

Canopy Corp. v. Symantec Corp., 395 F. Supp. 2d 1103 (D. Utah 2005)................................11

CECO Corp. v. Concrete Specialists, 772 P.2d 967 (Utah 1989)...........................................37

Chicago, R.I. & P.E. Co. v. Dobry Flour Mills, 211 F.2d 785 (10th Cir. 1954) ...............21, 22

CIG Exploration, Inc. v. Hill, 824 F. Supp. 1532 (D. Utah 1993)...........................................12

Conoco, Inc. v. BOH Bros. Constr., 191 F.R.D. 107 (W.D. La. 1998)...................................22

Cook v. Zions First Natl. Bank, 919 P.2d 56 (Utah App. 1996)............................................23

Consolidated Rail Corp. v. Ford Motor Co., 751 F. Supp. 2d 674 (E.D. Mich. 1990)............22

Cottonwood Mall Co. v. Sine, 830 P.2d 266 (Utah 1992).................................................35, 36

Dixie State Bank v. Bracken, 764 P.2d 985 (Utah 1988) ......................................................35

Eggett v. Wasatch Energy Corp., 94 P.3d 193 (Utah 2004) ....................................23

Express Recovery Servs., Inc. v. Rice, 125 P.3d 108 (Utah App. 2005)................................12

Faulkner v. Farnsworth, 665 P.2d 1292 (Utah 1983) ...............................................11

Feuer v. Menkes Feuer, Inc., 187 N.Y.S.2d 116 (App. Div. 1959)..........................................20

Gillmor v. Macey, 121 P.3d 57 (Utah App. 2005) ....................................................9

Grand Trunk Western R. v. Auto Warehousing Co., 686 N.W.2d 756
(Mich. App. 2004)....................................................................................21, 22

Jaeco Pump Co. v. Inject-O-Meter Mfg. Co., 467 F.2d 317 (10th Cir. 1972).........................27

James Constructors v. Salt Lake City Corp., 888 P.2d 665
(Utah App. 1994) ...................................................................33, 34, 35, 39, 42

Karl v. Commonwealth Land Title Ins. Co., 24 Cal. Rptr. 2d 912 (App. 1993) .....................45

MacKay v. 7-Eleven Sales Corp., 995 P.2d 1233 (Utah 2000) .................................15

Mann v. Reynolds, 46 F.3d 1055 (10th Cir. 1995)....................................................35

McClure v. Deerland Corp., 585 A.2d 19 (Pa. Super Ct. 1990).....................................22

Pan American Petroleum Corp. v. Maddux Well Service, 586 P.2d 1220 (Wyo. 1978)..........22

Pavoni v. Nielson, 999 P.2d 595 (Utah App. 2000) ...........................................33, 35

Peck v. Horrocks Engs. Inc., 106 F.3d 909 (10th Cir. 1997)....................................15

ProMax Dev't Corp. v. Raile, 998 P.2d 254 (Utah 2000) .........................................43

Ringwood v. Foreign Auto Works, 786 P.2d 1350 (Utah App. 1990) .............33, 34, 35, 39, 42

Rothey v. Walker Bank & Trust Co., 754 P.2d 1222 (Utah 1988)............................23

R & R Energies v. Mother Earth Indus., Inc., 936 P.2d 1068 (Utah 1997).............................11

Russ v Woodside Homes, 905 P.2d 901 (Utah App. 1995)......................................29

<u>Sac and Fox Nation of Missouri v. Pierce</u>, 213 F.3d 566 (10th Cir 2000) ..............................13

<u>Sears v. Riemersma</u>, 655 P.2d 1105 (Utah 1982) ......................................................12

<u>State Farm Mut. Auto Ins. v. Clyde</u>, 920 P.2d 1183 (Utah 1996) ...........................24

<u>Steffensen v. Smith's Mgt. Corp.</u>, 862 P.2d 1342 (Utah 1993) ................................32

<u>Stone Bldg. Co. v. Star Elec. Contractors</u>, 796 So. 2d 1076 (Ala. 2000) ................22

<u>Tiberi v. Cigna Corp.</u>, 89 F.3d 1423 (10th Cir. 1996) ............................................37

**<u>Statutes</u>**

Utah Code Ann. § 78-27-38(3) (2004) .............................................................30, 54

**<u>Other</u>**

41 Am. Jur. 2d <u>Indemnity</u> § 27 (2005)................................................................22

42 C.J.S. <u>Indemnity</u> § 24 (1991)..................................................18, 19, 20, 22, 51

42 C.J.S. <u>Indemnity</u> § 25 (1991)....................................................................23

Merriam-Webster's Tenth Collegiate New Dictionary (10th ed. 1997)......................................8

## RESPONSE TO STEWART'S STATEMENT OF UNDISPUTED FACTS

1.      In or about the month of February 1988, Stewart and Metro entered into a Title Insurance Underwriting Agreement attached hereto as Exhibit "A." *See* Exhibit "A;" Complaint at ¶ 9; and Answer at ¶ 9.

RESPONSE:  **Undisputed.**

2.      The Underwriting Agreement appointed Metro as a limited agent for Stewart for the purpose of issuing real property title insurance policies underwritten by Stewart in accordance with the authority, duties, limitations and conditions set forth in the Underwriting Agreement. *See* Exhibit "A;" Complaint at ¶ 10; and Answer at ¶ 10.

RESPONSE:  **Undisputed.**

3.      The Underwriting Agreement is a valid, enforceable agreement that was in full force and effect from February of 1988 until its termination in July 1999.  Complaint at ¶ 11; Order at p.2.

RESPONSE:  **Undisputed.**

4.      The Parties' obligations and duties to one another are established by the Underwriting Agreement and survive its termination. Complaint at ¶12; Order at p. 2.

RESPONSE:  **Disputed.**  The Court's order stated that Metro's reimbursement obligation accrues when each policy is issued and survives termination of the parties' Underwriting Agreement.  The order did not state that all of the parties' obligations and duties survive termination. The Underwriting Agreement specifically identifies the duties and obligations that do survive termination and it does not specify that the obligations to reimburse Stewart under paragraph 5 of

the Underwriting Agreement survive termination.   (See Order, June 22, 2006; Underwriting

Agreement, Exhibit 1 to the Addendum of Exhibits in Opposition to Motion for Summary Judg-

ment ("Add. Ex."), filed herewith; Metro's Memorandum in Support of Motion for Summary

Judgment, filed September 28, 2005.)

     5.     The Underwriting Agreement expressly provides for a division of loss and

expenses in the event that a loss is incurred on a title insurance policy issued by Metro.  *See*

Exhibit "A;" Complaint at ¶ 14; and Answer at ¶14; Order at p. 2.

     RESPONSE:  **Undisputed.**

     6.     Pursuant to the unambiguous terms of the Underwriting Agreement, Metro is

liable to indemnify Stewart for the first $2,500.00 of each loss under a Title Policy issued

pursuant to the Agreement that is not due to Metro's own negligence or fraud.  *See* Exhibit "A;"

Complaint at ¶15; Answer at ¶15; and Order at p. 2.

     RESPONSE:  **Undisputed.**

     7.     Pursuant to the unambiguous terms of the Underwriting Agreement, Metro is

liable to indemnify Stewart for the entire amount of each loss suffered or incurred by Stewart due

to the negligence, fraud, or intentional acts or omissions of Metro or its employees,

representatives, or agents.  *See* Exhibit "A." The Underwriting Agreement expressly defines

negligence to include, but not be limited to, the failure of Metro's title plant, failure of Metro to

discover or report any instrument of record affecting title, Metro's violation of escrow

instructions, Metro's failure to follow Stewart's instructions, and Metro's failure to prepare a title

policy in a manner that properly reflects any instrument of record and/or contained in the search of title. *Id.* Complaint at ¶ 16; Answer at ¶ 16; Order at p. 2.

<u>RESPONSE</u>:  **Disputed.**  The Underwriting Agreement specifically and unambiguously identifies Metro's duties to Stewart.  Pursuant to the Underwriting Agreement, Metro's duties to Stewart only require that Metro "shall conduct its business in a sound and ethical manner and shall issue title insurance policies, endorsements, binders and commitments according to recognized industry practices and the rules and instructions given by an Underwriter or imposed by the Department of Insurance or other regulatory body."  Stewart acknowledges that the "recognized practices and rules" means industry standards.  Stewart admits that paragraph 5 of the Underwriting Agreement is ambiguous, Stewart understands that negligence has a connotation of some fault, i.e. breaching a duty, but that the term negligence as defined in the Underwriting Agreement is defined as no fault or strict liability.  Stewart can not identify if anyone explained to Metro that the definition of negligence in the Underwriting Agreement means that the agent can be liable even without fault, which is contrary to the commonly accepted and judicially accepted definition of the term.  Stewart admits that industry standards do not require an agent to check every record in the Recorder's Office, but contends that the definition of negligence under the Underwriting Agreement would require the agent to examine every document in the Recorder's Office, which is contrary to standard industry practice.  Stewart also admits that even if an agent meets all of its duties under the Contract, the agent may still be liable to Stewart under its definition of negligence in paragraph 5 of the Underwriting Agreement.  (<u>See</u> Under-

writing Agreement, Add. Ex. 1; Deposition of Karen Storlie, Add. Ex. 2, at 260:6 - 264:7, 266:9-17, 268:12-17, 269:10-24, 274:19-23, 275:8-20.[1])

    8.    Metro concedes that the Underwriting Agreement is an indemnity contract. Metro's Memorandum Opposing Motion to Quash flied August 14, 2006 ("Memo. Opp. Motion to Quash") at p. 8.

    <u>RESPONSE</u>: **Disputed.** Metro's Memorandum Opposing Motion to Quash filed August 14, 2006, does not concede that the Underwriting Agreement is an indemnity contract. (<u>See</u> Underwriting Agreement, Add. Ex. 1; Metro's Memorandum Opposing Motion to Quash, filed August 14, 2006.)

    9.    The Underwriting Agreement was entered into in February 1988 and was terminated on July 26, 1999, pursuant to a written notice from Stewart. *See* Declaration of Nancy Frandsen ("Frandsen Decl.") filed contemporaneously herewith and attached hereto as Exhibit "C" and incorporated herein by this reference, at ¶ 3.

    <u>RESPONSE</u>: **Undisputed.**

    10.    During the period from February 1988 through July of 1999, the relationship between Metro and Stewart was valuable and essential to the title insurance business being conducted by Metro. *See* Deposition of Rodney Newman dated July 26, 2006 ("Rod Newman Depo."), pp. 48 and 49, copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

---

[1] Karen Storlie, a licensed attorney, was deposed as the designated Stewart representative at a properly noticed Fed. R. Civ. P. 30(b)(6) deposition. (<u>See</u> Storlie Deposition, Add. Ex. 2, at 6:1-5, 20:10-24.)

RESPONSE:  **Disputed.**  Mr. Rodney Newman testified that the relationship between Metro and Stewart was valuable.  He did not testify that the relationship was essential to the title insurance business being conducted by Metro.  Mr. Newman testified that Metro had to have an underwriter, but that it had five different underwriters other than Stewart.  (See Deposition of Rodney Newman, Add. Ex. 3, at 31:30-39.)

11.    According to Stewart's records, which are based on reports from Metro, during the period of time that Stewart underwrote title insurance policies issued by Metro, February 1988 through July 26, 1999, Metro collected approximately $8,638,609.00 in premiums from its customers, of which Metro retained approximately $7,598,089.00, with the balance of approximately $1,040,520.00 being paid to Stewart for underwriting the policies. Frandsen Decl. at ¶¶ 5 and 6, and Exhibit "C" attached thereto.

RESPONSE:  Metro objects to this paragraph on the grounds that it is not relevant to any issue in the pending action and is included simply to prejudice the Court.

12.    The Underwriting Agreement between Stewart and Metro was voluntarily signed in February 1988, by Rodney Newman, the President of Metro, after discussing the same with a representative from Stewart.  Rod Newman Depo. at pp. 50-52, and 54, copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Disputed in Part.**  No one at Stewart ever explained or discussed the meaning of the term "negligence" in paragraph 5 to Mr. Rodney Newman.  Specifically, Stewart did not explain that the definition of negligence was contrary to the commonly accepted definition of that term as used both in common English and in any judicial definition.  Moreover,

throughout the entire time the Underwriting Agreement was in place, both Stewart and Metro operated under the Underwriting Agreement using the common and judicially accepted definition of the term "negligence".  (<u>See</u> Storlie Depo., Add. Ex. 1, at 266:9-17; Rodney Newman Decl., Add. Ex. 4, ¶¶ 4-7.)

13.     Metro did not attempt to negotiate or make changes to the Underwriting Agreement when it was presented by Stewart to Rodney Newman for signature in 1988.  Rod Newman Depo. at p. 52.

<u>RESPONSE</u>:  **Undisputed.**  However, see response to paragraph 12 above.  Also, it is admitted by Stewart that the Underwriting Agreement was drafted by Stewart.  (<u>See</u> Storlie Depo., Add. Ex. 2, at 35:6-25, 38:19-21; Rodney Newman Depo., Add. Ex. 3, at 52:16-20.)

14.     Metro had the choice of several underwriters at the time of its formation in 1988, but voluntarily chose Stewart as its initial underwriter.  Rod Newman Depo. at p. 54.

<u>RESPONSE</u>:  **Undisputed.**

15.     Later, during the 1990s Metro also entered into underwriting agreements with other underwriters, using agreements provided by the underwriters.  Rod Newman Depo. at p. 56, a copy of which is attached hereto as part of Exhibit "D" and incorporated herein by this reference.

<u>RESPONSE</u>:  **Undisputed.**

16.     As with the Stewart Underwriting Agreement, when Metro entered into the underwriting agreements with other underwriters during the 1990s, Metro did not negotiate with the underwriters the major deal terms contained in the underwriting agreements, such as the

duties and responsibilities of the parties to the underwriting agreements. Rod Newman Depo. at pp. 56 through 58, copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Disputed.**  Mr. Rodney Newman testified that he negotiated changes to the underwriting agreements with other underwriters including rates, deductibles, policy limits, file ownership, and retention requirements.  (See Rodney Newman Depo., Add. Ex. 3, at 56:21 - 57:19.)

17.     During the course of the business relationship between Metro and Stewart it was Metro's policy to perform accurate title searches, to produce accurate and complete title policies, and to accurately and completely follow escrow instructions received by Metro.  Rod Newman Depo. at pp. 62-65 and 83-84, copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Undisputed.**

18.     Customers of Metro had the right to rely on the accuracy of any title report or title policy generated by Metro.  Rod Newman Depo. at p. 98, a copy of which is attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Undisputed.**

19.     Under Section 5 of the Underwriting Agreement, the term "loss" is defined to mean anything paid by Stewart to the insured or for the benefit of the insured, including loss adjustments and attorney defense costs. *See* Exhibit "A." *See also* Declaration of Karen Storlie ("Storlie Decl."), filed contemporaneously herewith and attached hereto as Exhibit "E" and

incorporated herein by this reference, at ¶ 6.  *See also* Rod Newman Depo. at pp. 7 1-72, and 75, copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Disputed.**  Section 5(A) of the Underwriting Agreement reads as follows: "The term loss shall include the amount paid to or for the benefit of the insured as well as loss adjustment expense including any cost of defending the claim resulting in the loss."  (See Underwriting Agreement, Add. Ex. 1.)

20.     Under paragraph 5.A. of the Underwriting Agreement, Metro agreed to indemnify and pay to Stewart the amount of $2,500.00 for any loss incurred by Stewart on a policy issued by Metro that was incurred not as a result of Metro's negligence or fraud.  Storlie Decl. at ¶ 7. Rod Newman Depo. at p. 74, a copy of which is attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Undisputed.**

21.     Regardless of the magnitude of the loss incurred by Stewart on a title policy issued by Metro, if such loss is not due to the negligence or fraud of Metro, the total indemnity exposure of Metro to Stewart is $2,500.00.  Storlie Decl. at ¶ 8.  *See* Exhibit "A." *See also* Rod Newman Depo. at p. 76, a copy of which is attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Undisputed.**

22.     Under paragraph 5.B. of the Underwriting Agreement, Metro is obligated to indemnify and pay to Stewart all losses incurred by Stewart, including loss adjustments and costs

of defense, if such losses are the result of Metro's or Metro's employees', representatives', or agents', fraud, intentional act or omission, or negligence, including, but not limited to, the failure of the title plant, failure to discover or report any instrument of record affecting title, violation of escrow instructions, failure to follow underwriter's instructions, and the failure to prepare a title policy in a manner that properly reflects any instrument contained in the search of title. *See* Exhibit "A." *See also* Storlie Decl. at ¶ 9. *See also* Exhibit "A" attached hereto.

RESPONSE: **Disputed.** Paragraph 5(B) of the Underwriting Agreement reads in part as follows: "On each such loss *due to* the negligence, fraud, or intentional act or omission of [Metro] or its employees, representatives, or agents, [Metro] shall liable to [Stewart] for the entire amount of such loss." (Emphasis added.) Stewart's Rule 30(b)(6) designated representative testified that under the terms of paragraph 5(B) of the Underwriting Agreement, Metro is only responsible for Metro's negligence and "Stewart Title is responsible for its own negligence." (Storlie Depo., Add. Ex. 2, at 147:17-148:10.)

23.   Under the express terms of every title policy prepared by Metro and underwritten by Stewart, Stewart's duties to settle, defend, or pay claims run to the insured and not to Metro or any other party.  Storlie Decl. at ¶ 10.

RESPONSE: **Disputed.** Stewart has obligations under the law which run to Metro with regards to settling, defending or paying claims for which it will seek reimbursement from Metro. See Section I(B)(1) below.

24.   On June 22, 2006, this Court entered an Order Denying Metro National Title's Motion for Summary Judgment and Granting Stewart Title's Motion for Summary Judgment

based on the reasons set forth in Stewart's Cross-Motion for Summary Judgment and holding that "the unambiguous language of the title insurance underwriting agreement between Stewart Title and Metro National when read as a whole to effect the parties' intention provides that Metro's reimbursement obligation accrues when each policy is issued, and survives termination of the parties' underwriting agreement."  Order at p. 2 (emphasis added).

RESPONSE:  **Undisputed.**

25.    Prior to executing the Underwriting Agreement between Metro and Stewart in 1988, Rod Newman, President of Metro, had been working with or for title companies since the early 1970's and had worked for Stewart both in Denver and Salt Lake City for several years prior to forming Metro in 1988.  Rod Newman Depo. at pp. 10 through 15, copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Undisputed.**

FIRST CAUSE OF ACTION—FAR WEST BANK

26.    On or about May 10, 1996, Metro issued a policy of title insurance in favor of Far West Bank, Policy No. 999401179712, Metro's File No. 96013122 (the "Far West Title Policy").  Storlie Decl. at ¶ 11.

RESPONSE:  **Undisputed.**

27.    Far West Bank made a claim upon Stewart against the Far West Title Policy as the result of a mechanic's lien foreclosure action filed against Far West Bank by Mountain Valley Sheet Metal, L.C. in the case styled Mountain Valley Sheet Metal, L. C. v. Richard E.

Miller, et al., Fourth Judicial District Court of Utah County, State of Utah, Civil No. 9704-256 (the "Far West Litigation").  Storlie Decl. at ¶ 12.

RESPONSE:  **Undisputed.**

28.    Under the Far West Bank claim, Stewart was obligated under the Far West Title Policy to defend its insured, and Stewart retained Sherman Young of Ivie & Young to defend its insured, Far West Bank.  Storlie Decl. at ¶ 13.

RESPONSE:  **Undisputed.**

29.    As the result of the Far West Bank Claim, Stewart incurred a loss of $3,907.56 in attorneys' fees and litigation costs paid to Ivie & Young to defend Far West Bank.  Storlie Decl. at ¶ 14.

RESPONSE:  **Disputed.**  Metro objects to this paragraph on the grounds that Ms. Storlie has no foundation to make this statement.  She has not attached any documents identifying any fees paid by Stewart.  Stewart has produced no evidence that the attorney fees paid by Stewart to Ivie & Young were for the Farr West claim, or that such attorney fees were reasonable and necessary.  The only evidence on attorney fees produced by Stewart in discovery is limited to those entries on Stewart's Policy Loss Reports.  Stewart admits that in looking at the Policy Loss Reports, one cannot identify what any entry was actually paid for and also admits it is possible that those reports contained mistakes as far as payments and may not be accurate.  Stewart admits that there is no way to determine from the Policy Loss Reports what work was actually performed by the attorney or what work was being billed for by the attorney on the matter.  Thus, the Policy Loss Reports do not identify whether the fees were necessary and reasonable.  Stewart

also admits that there are errors and there is no way to check if the reports show the amounts were billed correctly or were entered into the computer correctly.  (See Storlie Depo., Add. Ex. 2, at 181:25 - 182:15, 183:6-16, 184:4-30, 212:9 - 213:22, 227:10 - 228:6, 246:10-14, 513:5-22.)

30.     The parties in the Far West Litigation eventually stipulated to release the mechanic's lien and to dismiss the action with regard to Far West Bank and certain other defendants.  Storlie Decl. at ¶ 15.

RESPONSE:  **Undisputed.**

31.     As a result of the facts and circumstances surrounding the dismissal, Stewart determined that the loss incurred by Stewart was not due to Metro's negligence or fraud, and made claim upon Metro for $2,500.00 under Paragraph 5.A. of the Underwriting Agreement, which claim was set forth in that certain letter dated July 20, 2004, from Stewart's counsel to Metro (the "Demand Letter"). Storlie Decl. at ¶ 16 and Exhibit 2 attached thereto.

RESPONSE:  **Undisputed.**

32.     As of the date of this Memorandum in Support, Metro has failed or refused to pay the amount set forth in the Demand Letter and under the First Cause of Action of the Complaint. Storlie Decl. at ¶ 17.

RESPONSE:  **Disputed.**  Metro paid $2,500 for this claim to Stewart through Check No. 2194 date July 23, 1998.  (See Declaration of Al Newman, Add. Ex. 5, ¶ 2; Check 2194, Add. Ex. 6.)

SECOND CAUSE OF ACTION—RUBBER BALL PRODUCTIONS

33.    On or about June 16, 1998, Metro issued a policy of title insurance in favor of Rubber Ball Productions ("Rubber Ball"), Policy No. 9993-1003392, Metro's File No. 98014387 (the "Rubber Ball Title Policy"). Storlie Decl. at ¶ 18.

RESPONSE:  **Disputed.**  This policy was issued only at the express direction of Stewart, through its agent Arlen Taylor.  (See Al Newman Decl., Add. Ex. 5, ¶ 3.)

34.    Rubber Ball made a claim upon Stewart against the Rubber Ball Title Policy as the result of a mechanic's lien foreclosure action and judgment affecting the property covered by the Rubber Ball Title Policy in the case styled Paul E. Healey Plumbing and Heating, Inc. v. Richard E. Miller, et al., Fourth Judicial District Court of Utah County, State of Utah, Civil No. 9704-592 (the 'Rubber Ball Litigation"). Storlie Decl. at ¶ 19.

RESPONSE:  **Undisputed.**

35.    Under the Rubber Ball claim, Stewart was obligated under the Rubber Ball Title Policy to defend its insured, and Stewart retained Sherman Young of Ivie & Young to defend its insured, Rubber Ball. Storlie Decl. at ¶ 20.

RESPONSE:  **Undisputed.**

36.    As the result of the Rubber Ball Claim, Stewart incurred a loss of $6,806.08 in attorneys' fees and litigation costs paid to Ivie & Young, and an additional $5,000.00 to settle the litigation. Storlie Decl. at ¶ 21.

RESPONSE:  **Disputed.**  Metro objects to this paragraph on the grounds that Ms. Storlie has no foundation to make this statement.  She has not attached any documents identifying any

fees paid by Stewart.  Stewart has produced no evidence that the attorney fees paid by Stewart to Ivie & Young were for the Rubber Ball claim, or that such attorney fees were reasonable and necessary.  The only evidence on attorney fees produced by Stewart in discovery is limited to those entries on Stewart's Policy Loss Reports.  Stewart admits that in looking at the Policy Loss Reports, one cannot identify what any entry was actually paid for and also admits it is possible that those reports contained mistakes as far as payments and may not be accurate.  Stewart admits that there is no way to determine from the Policy Loss Reports what work was actually performed by the attorney or what work was being billed for by the attorney on the matter.  Thus, the Policy Loss Reports do not identify whether the fees were necessary and reasonable.  Stewart also admits that there are errors and there is no way to check if the reports show the amounts were billed correctly or were entered into the computer correctly.  (See Storlie Depo., Add. Ex. 2, at 181:25 - 182:15, 183:6-16, 184:4-30, 212:9 - 213:22, 227:10 - 228:6, 246:10-14, 513:5-22.)

37.     The parties in the Rubber Ball Litigation eventually settled the matter *and* stipulated to dismiss the action. Storlie Decl. at ¶ 22.

RESPONSE:  **Undisputed.**

38.     As a result of the facts and circumstances surrounding the dismissal, Stewart determined that the loss incurred by Stewart was not due to Metro's negligence or fraud, and made claim upon Metro for $2,500.00 under Paragraph 5.A. of the Underwriting Agreement, which claim was set forth in the Demand Letter. Storlie Decl. at 11 23.

RESPONSE:  **Disputed**.  This policy was issued only at the express direction of Stewart through its agent Arlen Taylor.  (See Al Newman Decl., Add. Ex. 5, ¶¶ 3-5 and Exhibit B

thereto.)  Additionally, in its Policy Loss Reports, Stewart acknowledged and admitted that the loss for the Rubber Ball matter was not "billable" to Metro.  (<u>See</u> Storlie Depo., Add. Ex. 2, at 500:22 - 501:13; Rubber Ball Claim Policy Loss Report, Add. Ex. 7.)  On the Policy Loss Report, when Stewart puts "YES" next to "BILLABLE," Stewart means that the agent is liable to Stewart for the loss under the Underwriting Agreement; when Stewart places a "NO" next to "BILLABLE," it means the agent is not liable to Stewart under the Underwriting Agreement. (<u>See</u> Storlie Depo., Add. Ex. 2, at 180:1-9.)

39.     As of the date of this Memorandum in Support, Metro has failed or refused to pay the amount set forth in the Demand Letter and under the Second Cause of Action of the Complaint. Storlie Decl. at ¶ 24.

<u>RESPONSE</u>:  **Disputed.** Arlen Taylor, agent for Stewart, specifically acknowledged to Metro that it was not responsible for this claim.  (<u>See</u> Al Newman Decl., Add. Ex. 5, ¶ 5 and Exhibit B thereto.)

THIRD CAUSE OF ACTION—HOLLOW POINTE, LC

40.     On or about March 30, 1998, Metro caused a policy of title insurance to be issued by its agent, Coalition Title Agency, Inc., in favor of Hollow Pointe, L.C. ("Hollow Point"), Policy No. 0-9993-2001129, Metro's File No. 9701 8961A (the "Hollow Pointe Title Policy"). *See* Storlie Decl. at ¶ 25. *See* also Deposition of Rodney Newman at pp. 104-105 (relating to the agency relationship between Metro and Coalition Title), copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Disputed.**  The title policy issued in favor of Hollow Pointe was issued by Coalition Title Agency, Inc. and not by Metro.  Coalition Title Agency, Inc. was not an agent of Metro.  (<u>See</u> Hollow Pointe Title Insurance Policy, Add. Ex. 8; Al Newman Decl., Add. Ex. 5, ¶ 6; Storlie Depo., Add. Ex. 2, at 390:8-9.)

41.    Metro served as the escrow closing agent in the transaction. Storlie Decl. at ¶ 26, and Exhibit 2 attached thereto.

RESPONSE:  **Undisputed.**  However, Stewart admits that it has no contract with Metro concerning escrow services and that any possible escrow claims against Metro concerning the Hollow Point transactions have nothing to do with Stewart.  (<u>See</u> Storlie Depo., Add. Ex. 2, at 38:12-16, 51:2-16.)

42.    Hollow Pointe made a claim upon Stewart under the Hollow Pointe Title Policy based upon causes of action involving rescission and quiet title alleged in an action filed against Hollow Pointe and Metro in the case styled Suzy Burton et al. v. Metro National Titles et al., Third Judicial District Court of Salt Lake County, State of Utah, Civil No. 000906897 (the "Hollow Pointe Litigation").  Storlie Decl. at ¶ 27.

RESPONSE:  **Undisputed.**

43.    Under the Hollow Pointe claim, Stewart was obligated under the Hollow Pointe Title Policy to defend its insured, and Stewart retained Sean Monson, then of Manning, Curtis, Bradshaw & Bednar, to defend its insured, Hollow Point.  Storlie Decl. at ¶ 28.

RESPONSE:  **Undisputed.**

44.     As the result of the Hollow Pointe Claim, Stewart incurred a loss of $4,369.58 in attorneys' fees and litigation costs paid to Manning, Curtis, Bradshaw & Bednar to defend Hollow Pointe.  Storlie Decl. at ¶ 29.

RESPONSE:  **Disputed.**  Metro objects to this paragraph on the grounds that Ms. Storlie has no foundation to make this statement.  She has not attached any documents identifying any fees paid by Stewart.  Stewart has produced no evidence that the attorney fees paid by Stewart to Manning Curtis were for the Hollow Pointe claim, or that such attorney fees were reasonable and necessary.  The only evidence on attorney fees produced by Stewart in discovery is limited to those entries on Stewart's Policy Loss Reports.  Stewart admits that in looking at the Policy Loss Reports, one cannot identify what any entry was actually paid for and also admits it is possible that those reports contained mistakes as far as payments and may not be accurate.  Stewart admits that there is no way to determine from the Policy Loss Reports what work was actually performed by the attorney or what work was being billed for by the attorney on the matter.  Thus, the Policy Loss Reports do not identify whether the fees were necessary and reasonable.  Stewart also admits that there are errors and there is no way to check if the reports show the amounts were billed correctly or were entered into the computer correctly.  (See Storlie Depo., Add. Ex. 2, at 181:25 - 182:15, 183:6-16, 184:4-30, 212:9 - 213:22, 227:10 - 228:6, 246:10-14, 513:5-22.)

45.     The parties in the Hollow Pointe Litigation eventually agreed to settle the matter to dismiss the action with regard to Hollow Pointe, Metro, and other defendants.  Storlie Decl. at ¶ 30.

RESPONSE:  **Undisputed.**

46.     As a result of the facts and circumstances surrounding the dismissal, Stewart determined that the loss incurred by Stewart was not due to Metro's negligence or fraud, and made claim upon Metro for $2,500.00 under Paragraph 5.A. of the Underwriting Agreement, which claim was set forth in the Demand Letter.  Storlie Decl. at ¶ 31.

RESPONSE:  **Disputed.**  Metro did not issue the title policy in question.  Stewart admits that under its Underwriting Agreement, paragraphs 2(d) and paragraph 5, only those losses "under a title policy issued pursuant to the Agreement" entitles Stewart to any reimbursement.  (See Storlie Depo., Add. Ex. 2, at 45:14-23.  (See also Hollow Pointe Title Policy, Add. Ex. 8.)  Also, Stewart determined in its Policy Loss Reports and other documents that the alleged loss was not billable to Metro under the Underwriting Agreement.  (See Storlie Depo., Add. Ex. 2, at 386:22 - 388:8, 388:20 - 390:2; Hollow Pointe Claim Policy Loss Report, Add. Ex. 9; Change of Status Form, Add. Ex. 10.)  On the Policy Loss Report, when Stewart puts "NO" next to "BILLABLE," it means the agent is not liable to Stewart under the Underwriting Agreement.  (See Storlie Depo., Add. Ex. 2, at 180:1-9.)

47.     As of the date of this Memorandum in Support, Metro has failed or refused to pay the amount set forth in the Demand Letter and under the Third Cause of Action of the Complaint.  Storlie Decl. at ¶ 32.

RESPONSE:  **Disputed.**  Metro did not issue the title policy and therefore any amounts set forth in the demand letter are not properly recoverable against Metro.  (See Underwriting Agreement, Add. Ex. 1; Hollow Pointe Title Policy, Add. Ex. 8; Al Newman Decl., Add. Ex. 5, ¶ 6.)

FOURTH CAUSE OF ACTION—FIRST WESTERN NATIONAL BANK

48.     On or about July 17, 1998, Metro issued a policy of title insurance in favor of First Western National Bank ("First Western"), Policy No. 9994-91149, Metro's File No. 98020247 (the "First Western Title Policy").  Storlie Decl. at ¶ 33.

RESPONSE:  **Undisputed.**

49.     First Western made a claim upon Stewart against the First Western Title Policy as the result of a non-judicial foreclosure action filed by Clifford V. Dunn as Trustee for Best Western Capitol Resort, LLC involving real property in which First Western had an insured interest under the First Western Title Policy.  Storlie Decl. at ¶ 34.

RESPONSE:  **Undisputed.**

50.     In an effort to enjoin the non-judicial foreclosure action, Capitol Reef Properties, L.C., First Western's borrowers and owners of the property described in the First Western Title Policy, brought suit against Best Western Capitol Reef Resort and Clifford Dunn in a case styled Capitol Reef Properties, LC v. Best Western Capitol Reef Resort et al., Sixth Judicial District Court of Wayne County, State of Utah, Civil No. 030600003 (the "First Western Litigation").  Storlie Decl. at ¶ 35.

RESPONSE:  **Undisputed.**

51.     Under the First Western claim, Stewart was obligated under the First Western Title Policy to defend its insured, and Stewart retained David P. Hirschi of Hirschi Christensen to defend its insured, First Western, and to file a Third Party Complaint in the First Western Litigation.  Storlie Decl. at ¶ 36.

RESPONSE:  **Disputed in Part.**  Stewart determined that the claim was not covered by the policy and denied coverage under the terms of the policy.  (See Letter from John Holt to Michael Friedman, February 20, 2003, Add. Ex. 11.

52.     The required involvement of First Western in the First Western Litigation was the direct result of a failure by Metro and its agent, Utah Title and Abstract Company of Central Utah, to properly identify in the First Western Title Policy the encumbrances existing upon the real property securing the First Western loan as insured by the First Western Title Policy.  Storlie Decl. ¶ 37.  *See also* Declaration of David W. Moore ("Moore Decl.") filed contemporaneously herewith and attached hereto as Exhibit "F" and incorporated herein by this reference at ¶ 28-34. Deposition of Alfred J. Newman ("Al Newman Deposition") at pp. 9 and 19-20, copies of which is attached hereto as part of Exhibit "G" and incorporated herein by this reference; and Rod Newman Deposition at pp. 116-120 (with regard to the agency relationship between Metro and Utah Title and Abstract Company of Central Utah and the issuance of the First Western Policy by Metro), copies of which are attached hereto as part of Exhibit "D" and incorporated herein by this reference.

RESPONSE:  **Disputed.**  Stewart cannot identify anything that Metro missed in doing its title search therefore cannot identify any negligence on behalf of Metro.  (See Storlie Depo., Add. Ex. 2, at 357:2 - 359:15.)  Also, Metro objects to this paragraph on the grounds that Stewart cannot change the testimony it gave at the Rule 30(b)(6) deposition and also that Stewart has admitted that the title commitment issued by Metro corresponds exactly with the legal description

and trust deeds that were being foreclosed.  (Storlie Depo. at 383:1-20; E-mail from John Holt to Karen Storlie, February 20, 2003, Add. Ex. 12.)

53.    Metro was negligent under Paragraphs 3.A. and 5.B. of the Underwriting Agreement in the preparation and issuance of the First Western Title Policy in that it failed in the First Western Title Policy to properly report an instrument of record adversely affecting First Western's lien on the insured property.  Storlie Decl. at ¶ 38.  *See also* Moore Decl. at ¶ 28-34.  Al Newman Deposition at p. 64, a copy of which is attached hereto as part of Exhibit "G" and incorporated herein by this reference.

RESPONSE:  **Disputed.**  Stewart cannot identify anything that Metro missed in doing its title search therefore cannot identify any negligence on behalf of Metro.  (See Storlie Depo. at 357:2 - 359:15.)  Also, Metro objects to this paragraph on the grounds that Stewart cannot change the testimony it gave at the Rule 30(b)(6) deposition and also that Stewart has admitted that the title commitment issued by Metro corresponds exactly with the legal description and trust deeds that were being foreclosed.  (Storlie Depo. at 383:1-20; E-mail from John Holt to Karen Storlie, February 20, 2003, Add. Ex. 12.)

Metro further objects that Ms. Storlie's unsupported testimony that Metro was "negligent" is a legal conclusion.  Moreover, Ms. Storlie has not demonstrated that she has the proper foundation to testify regarding allegations of negligence.  The testimony, therefore, may not be considered by the Court.

54.    As the result of the First Western Claim and the negligence of Metro in the issuance of the First Western Title Policy, Stewart incurred a loss of $20,557.88 in attorneys' fees

and litigation costs paid to Hirschi Christensen and $2,996.00 in attorney's fees and costs paid to First Western's counsel, Michael Friedman of Lottner Rubin Fishman Brown & Saul P.C., to defend First Western.  Storlie Decl. at ¶ 39.

RESPONSE:  **Disputed.**  Metro objects to this paragraph on the grounds that Ms. Storlie has no foundation to make this statement.  She has not attached any documents identifying any fees paid by Stewart.  Stewart has produced no evidence that the attorney fees paid by Stewart to Hirschi Christensen or Lottner Rubin were for the First Western claim, or that such attorney fees were reasonable and necessary.  The only evidence on attorney fees produced by Stewart in discovery is limited to those entries on Stewart's Policy Loss Reports.  Stewart admits that in looking at the Policy Loss Reports, one cannot identify what any entry was actually paid for and also admits it is possible that those reports contained mistakes as far as payments and may not be accurate.  Stewart admits that there is no way to determine from the Policy Loss Reports what work was actually performed by the attorney or what work was being billed for by the attorney on the matter.  Thus, the Policy Loss Reports do not identify whether the fees were necessary and reasonable.  Stewart also admits that there are errors and there is no way to check if the reports show the amounts were billed correctly or were entered into the computer correctly.  (See Storlie Depo., Add. Ex. 2, at 181:25 - 182:15, 183:6-16, 184:4-30, 212:9 - 213:22, 227:10 - 228:6, 246:10-14, 513:5-22.)

The attorney fees paid to the law firm of Lottner Rubin Fishman Brown & Saul were paid voluntarily by Stewart.  Stewart was not obligated to pay for such fees under its Title Insurance

Agreement with the insured.  (<u>See</u> Storlie Depo., Add. Ex. 2, at 375:19 - 377:19; Letter from

John Holt to Michael Friedman, April 15, 2003, and related documents, Add. Ex. 13.)

    55.    Based on further review of the documents during discovery, the total loss incurred

by Stewart in the First Western matter is $23,553.88 rather than the $24,500.00 stated in the

Complaint.  Storlie Decl. at ¶ 40.

    <u>RESPONSE</u>:  **Disputed.**  <u>See</u> response to paragraph 54 above.

    56.    The parties in the First Western Litigation eventually stipulated to a settlement of

the claims based on payments being made over approximately two years by Capitol Reef Proper-

ties, L.C. to Best Western Capitol Reef Resort.  The parties agreed to dismiss the action and to

withdraw the non-judicial foreclosure upon completion of the payments required under the

settlement agreement.  Storlie Decl. at ¶ 41.

    <u>RESPONSE</u>:  **Disputed.**  Paragraph 41 of the Storlie Declaration is hearsay and may not

be considered by the Court.

    57.    As a result of this dismissal and based on the errors contained in the title policy

issued by Metro, Stewart determined that the loss incurred by Stewart was due to Metro's. negli-

gence, as defined in the Underwriting Agreement, and made claim upon Metro for $24,500.00

under Paragraph 5.B. of the Underwriting Agreement, which claim was set forth in the Demand

Letter.  Based on information obtained during discovery, this claim has been revised to

$23,553.88.  Storlie Decl. at ¶ 42.

RESPONSE:  **Disputed.  See** responses to paragraphs 53-56 above.  Metro also objects that this paragraph is a legal conclusion for which Ms. Storlie has no foundation and may not be considered by the Court.

58.     As of the date of this Memorandum in Support, Metro has failed or refused to pay any amount under the Fourth Cause of Action of the Complaint.  Storlie Decl. ¶ 43.

RESPONSE:  **Disputed.  See** responses to paragraphs 53-57 above.

FIFTH CAUSE OF ACTION—ARNOLD INDUSTRIES

59.     On or about July 10, 1992, Metro issued a policy of title insurance in favor of Arnold Industries ("Arnold"), Policy No. 9982-000472713, Metro's File No. 92005211, and on July 22, 1993, Metro issued a policy of title insurance in favor of Arnold, Policy No. 9993-000069585, Metro's File No. 93007860 (the "Arnold Title Policies").  Storlie Decl. at ¶ 44.

RESPONSE:  **Undisputed.**

60.     Arnold made a claim upon Stewart against the Arnold Title Policies as the result of a claim of easement against the insured property by William S. Love and Irene C. Love. Storlie Decl. at ¶ 45.

RESPONSE:  **Undisputed.**

61.     Under the Arnold claim, Stewart was obligated under the Arnold Title Policies to defend its insured, and Stewart retained William Meaders, then of Meaders & Lundberg and Sherman Young, of Ivie & Young, to defend its insured, Arnold, and John Wilson, of Parsons Behle & Latimer to assist in the management and resolution of the claim.  Storlie Decl. at ¶ 46.

<u>RESPONSE</u>:  **Disputed in Part.**  John Wilson of Parsons Behle & Latimer was hired to evaluate a claim of bad faith against the insured and then to bring a declaratory judgment action against the insured rather than to assist in the management and resolution of the claim.  He also <u>defended</u> a claim for bad faith brought against Stewart for the insured.  (<u>See</u> Storlie Depo., Add. Ex. 2, at 391:24 - 392:12, 397:3-13, 398:20 - 399:16, 402:23 - 403:5;  Stewart-Arnold Counterclaim, Add Ex. 14.)

62.    To defend against the claimed easement and to quiet title in the name of the insured, Arnold brought an action in Third District Court in and for Salt Lake County, Utah, in the case styled, *Arnold Industries, Inc. v. William S. Love, et al*., Civil No. 960906947PR, and the case was taken to the Utah Supreme Court on appeal as Appellate Case No. 20010266, cited 2002 UT 133; 63 P.3d 721 (Utah 2002), a copy of which is attached hereto as Exhibit "H" and incorporated herein by this reference.

<u>RESPONSE</u>:  **Disputed in Part.**  Metro objects to the inclusion of the Supreme Court opinion on the grounds that it is not relevant to any issue in this action.  Metro was not a party to that action, and as such no rulings in that action are binding in any way on Metro.  <u>See, e.g.</u>, <u>Sac and Fox Nation of Missouri v. Pierce</u>, 213 F.3d 566, 580 (10th Cir. 2000) (ruling in prior action is not binding on person that was not a party to that action).  Further, the case did not deal with any issue concerning the requirements for searching title for purposes of issuing a title policy.

63.    In Arnold the Utah Supreme Court stated that "with little or no effort other than searching the title of his own property" Arnold could have discovered documents relating to the Love easement and the Supreme Court went on to state: "Therefore, we hold that Arnold had

constructive notice of an easement and that an investigation of reasonable diligence within the public record would have given him actual notice of an easement [affecting his property]." *Arnold* at 730 (emphasis added).

RESPONSE:  **Disputed.**  Metro National Title was not a party to the case of *Arnold Industries, Inc. v. William S. Love, et al.*  There was no issue in that case concerning the adequacy of a title search by a title agent.  In holding that Arnold had constructive notice of an easement, the Utah Supreme Court relied heavily on the fact that the easement "was in open and obvious use" by Love's predecessor.  See Arnold Indus. v. Love, 63 P.3d at 729-30 ¶¶ 30-31. The standards of the industry and the practice of Stewart agents, however, counsel against making physical inspections of property in issuing title policies such as the policy under which Arnold made a claim against Stewart.  (See Expert Report of Mark Haik, Add. Ex. 15.)  See also objection to paragraph 62.

64.    As the result of the Arnold Claim and an unfavorable ruling pertaining to Metro's lack of diligence from the Utah Supreme Court, Stewart incurred a loss of $450,300.00 in settlement with Arnold and $287,832.61 in attorneys' fees to defend Arnold and settle the claim. Storlie Decl. at ¶ 47.

RESPONSE:  **Disputed.**  The losses were not incurred by Stewart "due" to the actions of Metro.  Stewart cannot identify how much of the claim was due to any alleged negligence by Metro and how much of the loss was caused by Stewart.  (See Storlie Depo., Add. Ex. 2, at 553:12-17, 572:15 - 573:12, 466:15 - 467:25, 477:3 - 478:7.)

Further, Metro objects to this paragraph on the grounds that Ms. Storlie has no foundation to make this statement.  She has not attached any documents identifying any fees paid by Stewart.  Stewart has produced no evidence that the attorney fees paid by Stewart were for the Arnold claim, or that such attorney fees were reasonable and necessary.  The only evidence on attorney fees produced by Stewart in discovery is limited to those entries on Stewart's Policy Loss Reports.  Stewart admits that in looking at the Policy Loss Reports, one cannot identify what any entry was actually paid for and also admits it is possible that those reports contained mistakes as far as payments and may not be accurate.  Stewart admits that there is no way to determine from the Policy Loss Reports what work was actually performed by the attorney or what work was being billed for by the attorney on the matter.  Thus, the Policy Loss Reports do not identify whether the fees were necessary and reasonable.  Stewart also admits that there are errors and there is no way to check if the reports show the amounts were billed correctly or were entered into the computer correctly.  (See Storlie Depo., Add. Ex. 2, at 181:25 - 182:15, 183:6-16, 184:4-30, 212:9 - 213:22, 227:10 - 228:6, 246:10-14, 513:5-22.)

Also, the only diminution in value to the property which is what was covered by the insurance policy was $50,300 according to Stewart.  (See Storlie Depo., Add. Ex. 2, at 542:6 - 543:33; Karen Storlie Memorandum of Telephone Call, May 29, 2003, Add. Ex. 16; Arnold Property Appraisal, Add. Ex. 17.  See also objection to paragraph 62.

65.    Based on information reviewed during discovery on this matter, the total loss incurred by Stewart on the Arnold claim was $738,132.61 rather than the $755,300.00 complained of in the Complaint.  Storlie Decl. ¶ 48.

RESPONSE:  **Disputed.**  See response to paragraph 64 above.

66.     Based on the documents appearing in Stewart's files and based on the decision and the specific language of the Utah Supreme Court in *Arnold Industries v. Love* relating to Arnold's [Metro's] failure to adequately or reasonably search the public records, Stewart determined that the loss incurred by Stewart was due to the intentional act or omission or the negligence of Metro, as defined in the Underwriting Agreement under Paragraphs 3.A. and 5.B. and made claim upon Metro for $755,300.00 under Paragraph 5.B. of the Underwriting Agreement, which claim was set forth in the Demand Letter.  Based on information obtained during discovery, this claim has been revised to $738,132.61.  *See Arnold* at 730 (as to the holding of the Utah Supreme Court); Storlie Decl. at ¶ 49; Moore Decl. at ¶ 10-21.

RESPONSE:  **Disputed.**  See responses to 63 and 64 above.  Also, Stewart determined on all of its Policy Loss Reports that the alleged losses were not billable to Metro pursuant to the terms of the Underwriting Agreement.  (See Storlie Depo., Add. Ex. 2, at 253:23 - 257:7, 280:11 - 281:18, 393:22 - 394:7, 530:18 - 532:6, Page 533:12 - 532:5, Page 562:2 - 563:14, 565:12 - 566:7; Arnold Policy Loss Reports, Add. Ex. 18.)

67.     As of the date of this Memorandum in Support, Metro has failed or refused to pay Stewart any amount under the Fifth Cause of Action of the Complaint. Storlie Decl. ¶ 50.

RESPONSE:  **Disputed.**  See responses to 63-66 above.

SIXTH CAUSE OF ACTION—DRAPER LAND LIMITED PARTNERSHIP

68.     On or about June 18, 1998, Metro issued a policy of title insurance in favor of Draper Land Limited Partnership No.2 ("Draper Land"), Policy No. 9993-0002748 10, Metro's File No. 97017832 (the "Draper Land Title Policy Title Policy").  Storlie Decl. at ¶ 51.

RESPONSE:  **Undisputed.**

69.     Draper Land made a claim upon Stewart as the result of Metro's failure to show in the Draper Land Title Policy a fee ownership interest of Draper Irrigation Company over a portion of the property insured in the Draper Land Title Policy. Storlie Decl. at ¶ 52.

RESPONSE:  **Disputed.**  The Title Policy issued by Metro in connection with Draper Land showed all of the proper recorded interests.  (See Al Newman Decl., Add. Ex. 5, ¶ 7.)

70.     Draper Land purchased the disputed property from Draper Irrigation Company for $13,558.00 and sought reimbursement from Stewart under the Draper Land Title Policy.  Storlie Decl. at ¶ 53.

RESPONSE:  **Disputed.**  Storlie's testimony is hearsay and may not be considered by the Court.

71.     As a result of the Draper Land claim, Stewart was obligated under the Draper Land Title Policy to investigate and resolve the issue of competing ownership interests in the insured property.  Storlie Decl. at ¶ 54.

RESPONSE:  **Undisputed.**

72.     Through the course of reviewing documents and negotiating with the attorneys for Draper Land, Stewart elected to settle the matter with Draper Land in the amount of $10,000.00. Storlie Decl. at ¶ 55.

RESPONSE:  **Undisputed.**

73.     As the result of the Draper Land claim, Stewart incurred a loss of $10,000.00, a portion of which, $2,500.00, has been paid by Metro, leaving the amount claimed in this action of $7,500.00.  Storlie Decl. at ¶ 56.

RESPONSE:  **Disputed.**  Stewart accepted $2,500 as full payment for the claim.  (See Al Newman Decl., Add. Ex. 5, ¶ 8.)

74.     Stewart determined that the loss incurred by Stewart was due to Metro's own act or omission, or negligence, as defined in the Underwriting Agreement under Paragraphs 3.A. and 5.B. and made claim upon Metro for $7,500.00 under Paragraph 5.B. of the Underwriting Agreement, which claim was set forth in the Demand Letter.  Storlie Decl. at ¶ 57; Moore Decl. at ¶ 35-39.

RESPONSE:  **Disputed.**  Metro did not fail to discover or report any instrument of record affecting title.  Metro issued the policy based on the title commitment issued by Metro which was based on a survey identifying the parcels by numbers supplied by the insured.  The insured never corrected the survey supplied to Metro.  (See Al Newman Decl., Add. Ex. 5, ¶¶ 7-9.)

75.     As of the date of this Memorandum in Support, Metro has failed or refused to pay the amount set forth in the Demand Letter and under the Sixth Cause of Action of the Complaint. Storlie Decl. at ¶ 58.

RESPONSE:  **Disputed.**  See response to 74.

SEVENTH CAUSE OF ACTION—C. DEAN CLARK D.P.M., INC.

76.     On or about November 20, 1996, Metro issued a policy of title insurance in favor of C. Dean Clark ("Clark"), Policy No. 9982-941834915, Metro's File No. 96016707 (the "Clark Title Policy").  Storlie Decl. at ¶ 59.

RESPONSE: **Undisputed.**

77.     Intermountain Mortgage, Inc. ("Intermountain"), the assignee of Clark, made a claim upon Stewart against the Clark Title Policy as the result of diminution in value of the insured property as a result of an existing railroad easement that Metro failed to show on the Clark Title Policy.  Storlie Decl. at ¶ 60.  See also Al Newman Deposition at p. 129, a copy of which is attached hereto as part of Exhibit "G" and incorporated herein by this reference.

RESPONSE: **Disputed**.  Intermountain *did not* make a claim upon Stewart against the Clark Title Policy based on the Railroad easement.  In fact, Intermountain's claim made no reference at all to the railroad easement.  The claim was based entirely on Intermountain's incorrect belief that the portion of the insured property that it offered at its foreclosure sale was subject to a senior trust deed held by Karl Bankowski.  The notice of claim read: "Because ***the presence of the Bankowski lien as an encumbrance against the Property rendered the Property valueless*** to my client, demand is hereby made for payment of the loss Intermountain Mortgage incurred under the Policy . . ."  (Letter from John T. Anderson to Stewart Title, February 28, 2001, Add. Ex. 19 (emphasis added).)

78.     Under the Intermountain claim, Stewart was obligated under the Clark Title Policy to resolve the issue of the missed easement with its insured, and Stewart retained the services of Jonathan L. Cook, MAI, and Daniel B. Goodman, Appraiser, of The Cook Group to perform a diminution of value appraisal (the "Cook Appraisal") on the insured property affected by the railroad easement.  Storlie Decl. at ¶ 61.

RESPONSE: **Disputed.**  As discussed in the preceding response, Intermountain did not make a claim against Stewart under the Clark Policy for a missed railroad easement and presented no evidence that it had incurred any loss based on the railroad easement.  Furthermore, under the terms of the title insurance policy issued as the basis of the Intermountain claim, the measure of Stewart's liability was "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance."  (Clark Policy, Add. Ex. 20, at p. 10, ¶ 7(a)(iii); see also Letter from John Holt to John T. Anderson, June 5, 2001, Add. Ex. 21 (Stewart's cover letter to its insured explaining its determination of liability and settlement offer).)  The "insured estate" as defined by the policy consisted of all of Parcel 1 and Parcel 2 (as identified in the policy) together.  (Storlie Depo., Add. Ex. 2, at 122.)  However, Stewart never obtained an appraisal to determine the value of the insured estate (that is, all of Parcel 1 and Parcel 2 together) as insured (without the railroad right-of-way encumbering Parcel 1) versus its value subject to the railroad right-of-way.  (Storlie Depo. at 113-14.)  Stewart therefore ordered an incorrect appraisal from the Cook Group.

79.     As the result of the Intermountain claim and based on the Cook Appraisal, Stewart incurred a loss of $92,000.00 in appraisal costs paid to The Cook Group ($2,000.00) and

in settlement costs paid to Intermountain ($90,000.00). Metro paid $2,500.00 toward this matter on or about March 5, 2002, leaving a total remaining loss to Stewart of $89,500.00. Storlie Decl. at ¶ 62.

RESPONSE: **Disputed.** Stewart paid $90,000 in settlement costs to Intermountain, not due to the missed easement (see response to No. 77 above), but due to Stewart's own fault in requesting an incorrect appraisal (see response to No. 78 above) and based on errors made in the appraisal which Stewart overlooked. (*See* Deposition of Nancy Frandsen, Add. Ex. 22, at 17:1-6, 22:24 - 23:7; E-mail from Nancy Frandsen to Denise Edwall, June 10, 2002, Add. Ex. 23, at STGC-001513 ("As Arlen and I discussed, it does seem that our appraiser based his assessments on an erroneous zoning criteria. This property is not buildable without frontage, and a zoning variance to allow it is highly unlikely. We understand the decision to pay based on the appraisal received, but the overage is our problem, not one to be passed on to the agent.").) Metro admits that it paid Stewart $2,500 on this claim as this is the extent of Metro's liability under the terms of the Underwriting Agreement.

80.     Based upon Metro's failure to discover or identify the existence of the railroad easement and to properly report the same on the Clark Title Policy, Stewart determined that the loss incurred by Stewart was due to Metro's own act or omission or negligence, as defined in the Underwriting Agreement under Paragraphs 3.A. and 5.B. and made claim upon Metro for $90,000.00 under Paragraph 5.B. of the Underwriting Agreement, which claim was set forth in the Demand Letter and the Complaint. Based on information obtained during discovery, this claim has been revised to $89,500.00. Storlie Decl. at ¶ 63; Moore Decl. at ¶ 22-27.

RESPONSE: **Disputed.**  As discussed in the preceding responses, Intermountain did not claim it suffered any loss due to the Railroad easement; Intermountain's claim was based on a claim that a senior trust deed had not been released.  Stewart's decision to pay $90,000 to Intermountain was not based upon Metro's act or omission or negligence; rather, it was due to Stewart's incorrect conclusion that Intermountain's failure to recover its debt at the foreclosure sale was solely due to the railroad easement when Stewart knew there had been an earlier foreclosure sale of the valuable portion of the insured estate (Storlie Depo., Add. Ex. 2, at 117) and that the portion of the insured estate offered at Intermountain's foreclosure sale was landlocked and without access to any street.  (See Storlie Depo. at 112, 116-17.)  Stewart's decision to pay $90,000 was also due to Stewart requesting an incorrect appraisal (*see* response to No. 78 above) and based upon the negligence of the Cook Group in preparing the appraisal which Stewart ignored prior to paying Intermountain. (see response to No. 79.)

81.     As of the date of this Memorandum in Support, Metro has failed or refused to pay any amount set forth under the Seventh Cause of Action of the Complaint.  Storlie Decl. at ¶ 64.

RESPONSE: **Undisputed.**

82.     To date Stewart has made demand upon Metro for the amount of $866,186.49 under the foregoing claims.  Storlie Decl. at ¶ 65.

RESPONSE:  **Disputed.**  See responses to paragraphs 1-81 above.

## <u>STATEMENT OF ADDITIONAL MATERIAL FACTS</u>

**A.      The Underwriting Agreement**

      1.      Paragraph 3 of the Underwriting Agreements sets forth all the duties Metro owes Stewart pursuant to the Title Insurance Underwriting Agreement in connection with conducting title searches and issuing title insurance policies.  In relevant part the Agreement states:

> A. Company [Metro] shall conduct its business in a sound and ethical manner and shall issue title insurance policies, endorsements, binders and commitments according to recognized practices and the rules and instructions given by Underwriter or imposed by the Department of Insurance or other regulatory body. All title polices must be based on a written report of title resulting from a search and examination of those public records, surveys and inspections relevant to the insurance afforded by such policies.

(Underwriting Agreement, Add. Ex. 1.)

      2.      Stewart acknowledges that the term "recognized practices" in paragraph 3(a) of the Underwriting Agreement means "industry standards."  (Storlie Depo., Add. Ex. 2, at 269:10-19.)

      3.      Stewart acknowledges that industry standards do not require an agent to check every record in the Recorder's Office.  (Storlie Depo., Add. Ex. 2, at 269:20-24.)

      4.      The term "rules and instructions given by Underwriter" in paragraph 3(a) of the Underwriting Agreement refers to Stewart manuals.  (Storlie Depo., Add. Ex. 2, at 269:15-16.)

      5.      Stewart cannot identify any manuals concerning underwriting which were given to Metro in connection with the Underwriting Agreement.  (Storlie Depo., Add. Ex. 2, at 44:15 -46:2.)

6.     Stewart did not supply Metro with any manuals concerning underwriting practices or title searches.  (Rodney Newman Decl., Add. Ex. 4, ¶ 8; Al Newman Decl., Add. Ex. 5, ¶ 10.)

7.     Paragraph 5 of the Underwriting Agreement requires that Metro reimburse Stewart for losses only for title policies issued pursuant to the Agreement, i.e. policies issued by Metro and not for any losses for policies issued by some other title company.  (Underwriting Agreement, Add. Ex. 1, ¶ 5.)

8.     Paragraph 5(b) of the Underwriting Agreement requires Metro to reimburse Stewart for only those losses which were <u>due</u> to Metro's negligence, fraud or intentional act or omission.   It does not require Metro to pay Stewart for any losses which were due to any other parties' negligence, fraud, intentional act or omission.  (Underwriting Agreement, Add. Ex. 1, ¶ 5(b)(emphasis added).)

9.     Stewart cannot identify any language in the Underwriting Agreement whereby Metro is required to pay for mistakes made by Stewart.  (Storlie Depo., Add. Ex. 2, at 458:22 - 459:13, 556:21 - 557:1.)

10.    The Underwriting Agreement does not require Metro to pay for items that Stewart voluntarily paid and which Stewart did not have a legal obligation under the insurance contract to pay.  (Storlie Depo., Add. Ex. 2, at 557:2-8.)

**B.    Stewart Never Coordinates with the Agent in the Defense or Settlement of a Claim by an Insured.**

11.    Stewart's policy is that the agent is never involved in the handling of a claim by an insured.  (Storlie Depo., Add. Ex. 2, at 73:11-19, 76:7-15.)

12.     Stewart has no guidelines for giving notice of any claim to its agents.  (Storlie Depo., Add. Ex. 2, at 75:17-21.)

13.     Stewart does not involve the agent at all in how to defend a claim filed against the policy issued by Stewart and does not involve the agent at all in selection of counsel.  (Storlie Depo., Add. Ex. 2, at 76:16-23, 77:2 - 78:10, 401:1-7.)

14.     Stewart does not have any policy or practice which requires it to involve the agent in any settlement discussions with an insured concerning a claim.  (Storlie Depo., Add. Ex. 2, at 78:19-24, 138:18 - 139:13, 158:21 - 159:5, 159:8 - 160:10.)

15.     It is the regular habit of Stewart to spend money with a law firm defending a claim knowing that it is going to ask its agent to reimburse Stewart for that money without having any input from the agent on whether that money should be spent.  (Storlie Depo., Add. Ex. 2, at 80:13-20, 401:1-7.)

16.     Under the Stewart policies, there is a possibility that the agent could be exposed to a very large damage number and Stewart does not have any policy about advising the agent of that fact.  (Storlie Depo., Add. Ex. 2, at 81:6-14, 403:7-21.)

**C.     Stewart's Loss Policies.**

17.     The measure of damages for a defect in title caused by a faulty title search, for which Stewart is required under its insurance contract to pay to the insured, is the diminution in value of the property.  (Storlie Depo., Add. Ex. 2, at 423:22 - 424:15.)

18.     If an appraisal done on a piece of a property for a loss covered by a policy reaches a wrong conclusion as to the amount of the loss, Stewart, under the terms of its policy, does not owe the wrong amount to the insured.  (Storlie Depo., Add. Ex. 2, at 160:11 - 163:8.)

19.     Stewart contends that Metro is liable for all losses that Stewart "booked" on a claim whether or not the losses were reasonable.  Stewart also claims that Metro is liable for losses that are unreasonable.  (Storlie Depo., Add. Ex. 2, at 288:13 - 289:6, 291:15 - 293:1.)

20.     Stewart contends that if Stewart makes a mistake on how much the loss under the policy actually is and if Stewart pays the mistaken amount, then Metro should be liable for such a loss.  (Storlie Depo., Add. Ex. 2, at 334:24 - 335.)

21.     If Stewart has an opportunity to settle a case but believes incorrectly that there is a strong legal argument against the claim and it turns out that Stewart is wrong, Stewart's position is that the loss is still the responsibility of the agent.  (Storlie Depo. at 339:12-22.)

**D.     The Arnold Industries Claim.**

22.     From the beginning of the Arnold litigation, Stewart took the position, which it believed was a valid position, that in the Arnold case there was no easement.  In fact, Stewart paid counsel for the insured almost $300,000 to pursue a claim that the easement was not valid. (Storlie Depo., Add. Ex. 2, at 242:12 - 251:15, 311:23 - 313:15, 335: - 337:12, 415:9 - 417:1.)

23.     Stewart did not give Metro any opportunity to have any input into the selection of counsel for the insured.  (Storlie Depo., Add. Ex. 2, at 284:13 - 287:12; Al Newman Decl., Add. Ex. 5, ¶ 11.)

24.     In the Arnold case, counsel for the insured, who was selected and was paid by Stewart, filed a claim against Salt Lake County for misindexing the relevant document concerning the alleged easement.  Stewart believed that was a viable legal position to take, i.e. that the fault was attributed to Salt Lake County and Stewart approved counsel's billing for that work, but did not consult with Metro on that issue.  (Storlie Depo., Add. Ex. 2, at 296:22 -298:1.)

25.     Stewart was aware in the Arnold case that Sherman Young, the counsel hired by Stewart for the insured in connection with the Arnold claim, claimed that the County, by misindexing a document, was responsible for the damage suffered by the insured.  Stewart agreed with that position and still agrees with that position.  (Storlie Depo., Add. Ex. 2, at 417:2 -418:15.)

26.     Stewart eventually settled the Arnold claim, but did so without advising Metro of the analysis performed by the lawyers that Stewart had hired and did not inform Metro that it might be responsible to pay more money than Stewart was offering in the settlement negotiations.  (Storlie Depo., Add. Ex. 2, at 431:9 - 433:11.)

27.     Stewart never consulted with Metro concerning any settlement discussions for the Arnold case.  (Al Newman Decl., Add. Ex. 5, ¶¶ 12-13.)

28.     Stewart believes that it could have settled the Arnold case for approximately $75,000.  Even though Stewart did not consult with Metro concerning the settlement, did not allow Metro to evaluate the position that Stewart was taking with regards to settlement, and did not offer Metro an opportunity to pay any monies towards a settlement, Stewart claims that

Metro is obligated to pay for Stewart's mistakes in regards to the Arnold claims.  (Storlie Depo., Add. Ex. 2, at 457:13 - 458:21.)

29.     Arlen Taylor was an underwriter employed by Stewart, to whom agents could look with questions concerning the issuance of title insurance policies and would give his approval on issuing various policies.  (Storlie Depo., Add. Ex. 2, at 85:8 - 86:14.)

30.     Arlen Taylor was the expert for the insured on the Arnold claim and testified that the easement did not exist and that no title agent searching the title would locate the alleged deed creating the easement because it had been misfiled by the County.  (Arlen Taylor Affidavit, Add. Ex. 24; Storlie Depo., Add. Ex. 2, at 515:13 - 516:4.)

31.     It is standard policy for a title agent examining title for purposes of issuing a title report to not make a physical examination of the property and that comported with Stewart's own requirements.  (Al Newman Decl., Add. Ex. 5; Expert Report of Mark Haik, Add. Ex. 15; Storlie Depo., Add. Ex. 2, at 163:9 - 164:19, 151:12-18.)

32.     Throughout the history of the litigation, Stewart's Policy Loss Reports reported that the alleged losses suffered as a result of the Arnold claim were not billable to Metro pursuant to the Underwriting Agreement.  (Storlie Depo., Add. Ex. 2, at 253:23 - 257:7, 280:11 - 281:18, 393:22 - 394:7, 530:18 - 532:6, 533:12 - 532:5, 562:2 - 563:14, 565:12 - 566:7, Policy Loss Reports, Add. Ex. 18.)

33.     During the course of the Arnold litigation, Stewart sent Metro Policy Loss Reports informing Metro that the alleged losses in connection with the Arnold claim were not

billable to Metro pursuant to the terms of the Underwriting Agreement.  (Al Newman Decl., Add. Ex. 5, ¶ 17 and Exhibit C thereto.)

34.     Agents are entitled to rely on documents that they receive from Stewart.  (Storlie Depo., Add. Ex. 2, at 500:18-20.)

35.     Stewart never tendered to Metro the prosecution or defense of the Arnold lawsuit. (Storlie Depo., Add. Ex. 2, at 409:24 - 410:18; Al Newman Decl., Add. Ex. 5, ¶ 15.)

36.     Stewart hired the law firm of Parsons Behle & Latimer to evaluate a claim of bad faith against the insured, to file a declaratory judgment action against the insured, and to defend the claim for bad faith brought against Stewart by the insured.  (Storlie Depo., Add. Ex. 2, at 397:3-13, 398:20, 399:16, 402:23.)

37.     Pursuant to an appraisal done by the appraiser hired by Stewart, the diminution in value to the Arnold property because of the easement was approximately $50,300.  Stewart filed a declaratory judgment action based on that appraisal.  (Storlie Depo., Add. Ex. 2, at 452:19 - 454:4.)

38.     On the amounts paid to settle the Arnold claim, there is no way for Stewart to determine how much was paid because of the diminution in value, how much was paid because of interest owed to the insured on the claim, how much was paid for the insured's attorney fees, and how much was paid for the release of the claim against Stewart for the breach of covenant of good faith and fair dealing.  (Storlie Depo., Add. Ex. 2, at 572:15 - 573:12.)

**E.      The Dean Clark Claim.**

39.      The "insured estate" identified in the Clark title policy consisted of two contiguous parcels that were both owned by Howcroft.  (See Clark Policy, Add. Ex. 20, at 1-2; Storlie Depo., Add Ex 2, at  122:14-22; Alfred Newman Depo., Add Ex. 26 at 28:5-14.)

40.      Parcel 2 (the "Front Parcel") was a subdivided lot.  (Storlie Depo., Add. Ex. 2, at 123: 6-8; Alfred Newman Depo., Add Ex. 26 at 28:2-4.)

41.      Howcroft's home was located on this Front Parcel.  (Alfred Newman Depo., Add Ex. 26 at 28:2-4.)

42.      Parcel 1 (the "Back Parcel") that was identified in the Clark title policy was contiguous with the back border of the Front Parcel.  The Back Parcel was not in any city subdivision and had the city's default agricultural zoning designation that did not permit a home to be built on this parcel. The Back Parcel had no street access other than by going over the Front Parcel as long as both parcels had common ownership as they did when the policy was issued. (See Appraisal, Add Ex. 17, at 64-65; Storlie Depo., Add Ex. 2 at 123:9-12; 125:10-24.)

43.      The railroad right-of-way encumbered the Back Parcel.  (John Holt Depo., Add. Ex. 25, at 22:21-24.)

44.      At the time the Clark title policy was issued, Howcroft had three senior trust deeds encumbering the Front Parcel which were excluded from the Clark title policy.  (See Clark Policy, Add Ex. 20, at 5-6.)

45.    Prior to the time that the trust deed insured by the Clark title policy was foreclosed, a foreclosure sale had been held on one of these senior trust deeds which wiped out any security Stewart's insured had in the Front Parcel.  (Storlie Depo., Add Ex. 2 at 117:9-18.)

46.    At the time the insured trust deed was foreclosed only the Back Parcel was offered for sale rather than the entire "insured estate" identified in the Clark title policy as consisting of both the Front Parcel and Back Parcel together.  (Storlie Depo., Add Ex. 2 at 106: 19-23; see also Notice of Trustee's Sale, Add. Ex. 40, at 2.)

47.    Prior to the time that Intermountain foreclosed its trust deed and made a claim to Stewart based on the Clark title policy, Stewart was aware that a senior lien holder had previously foreclosing the Front Parcel, wiping out Stewart's insured's interests in that parcel and that this severed the common ownership of the two parcels that made up the "insured estate." (Storlie Depo., Add. Ex. 2, at 112:1-6; 116:24-17:18.)

48.    Following Intermountain's foreclosure sale, when Intermountain made the claim on the Clark title policy it alleged its losses were due to an encumbrance completely unrelated to the railroad right-of-way.  The notice of claim read: "Because ***the presence of the Bankowski lien as an encumbrance against the Property rendered the Property valueless*** to my client, demand is hereby made for payment of the loss Intermountain Mortgage incurred under the Policy . . ."  (Notice of Clark Claim, Add. Ex. 41, at 1 (emphasis added).)

49.    Under the terms of the title insurance policy issued as the basis of the Clark policy claim, the measure of Stewart's liability was "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect,

lien or encumbrance."  (Clark Policy, Add. Ex. 20, at 10 (Section 7(a)(iii) of the Conditions and Stipulations portion of the policy.); see also Add. Ex. 21 (Stewart's cover letter to its insured explaining its determination of liability and settlement offer.))

50.     Stewart never obtained an appraisal to determine the value of the insured estate (that is, the entire Front Parcel and Back Parcel together) as insured (without the railroad right-of-way encumbering the Back Parcel) versus its value subject to the railroad right-of-way. (Storlie Depo., Add. Ex. 2, at 113:22-14:2.)

51.     Metro played no role in selecting the Cook Group for the appraisal that formed the basis of Stewart's Seventh Cause of Action, the C. Dean Clark, D.P.M., Inc. claim, or in giving the appraiser the assignment, or in reviewing the appraisal prior to the time Stewart settled with its insured.  (Storlie Depo., Add. Ex. 2, at 147:5-13.)

52.     Stewart's designated representative testified that if Stewart obtained an appraisal based on a claim and the appraisal is wrong, Stewart did not owe the incorrect appraisal amount. (Storlie Depo., Add. Ex. 2, at 162:16 - 163:8.)

53.     Under Stewart's Seventh Cause of Action, the C. Dean Clark, D.P.M., Inc. claim, Stewart did not send Metro a copy of the Cook Group appraisal until after Stewart paid Intermountain $90,000 under the Dean Clark Policy.  (Holt Depo., Add. Ex. 25  at 33:10-15.)

54.     After receiving a bill from Stewart for the $90,000 it paid to Intermountain for the C. Dean Clark, D.P.M., Inc. claim, and a copy of the Cook Group appraisal, Al Newman at Metro wrote a letter to John Holt at Stewart which included a description of errors that Al

Newman perceived in Cook Group Appraisal.  (Add. Ex. 34; Alfred Newman Depo., Add. Ex. 26, at 116:4-16.)

55.     Under Stewart's Seventh Cause of Action, the C. Dean Clark, D.P.M., Inc. claim, Stewart paid $90,000 in settlement costs to Intermountain, not due to the missed easement, but due to Stewart's own fault in requesting an incorrect appraisal and based on errors made in the appraisal which Stewart overlooked.  (See Nancy Frandsen Depo., Add. Ex. 22 at 7:1-6, 22:24 - 23:7; Add. Ex. 23, p. STGC-001513, Email letter written by Nancy Frandsen, Stewart's District Manager, which reads in part: "As Arlen and I discussed, it does seem that our appraiser based his assessments on an erroneous zoning criteria.  This property is not buildable without frontage, and a zoning variance to allow it is highly unlikely.  We understand the decision to pay based on the appraisal received, but the overage is our problem, not one to be passed on to the agent.").)

56.     In fact, after Stewart took note of the errors in the appraisal prepared by the Cook Group for the C. Dean Clark, D.P.M., Inc. claim, there was a discussion at Stewart about bringing a claim against the appraiser.  (Holt Depo., Add. Ex. 25, at 47:3-6.)

## SUMMARY OF ARGUMENT[1]

### Arnold Industries Claim (Fifth Cause of Action)

Stewart is not entitled to judgment as a matter of law on the Arnold Industries ("Arnold") claim. First, under the plain language of the Underwriting Agreement, Metro is only liable to indemnify Stewart for losses caused by Metro's negligence, fraud, or intentional act or omission. Stewart has not shown that Metro was negligent in issuing the Arnold policy.

Stewart asserts that Metro is strictly liable under the Underwriting Agreement for losses caused by any failure to discover a document affecting title, even if the failure to discover the document was *not* the result of Metro's negligence. This interpretation is simply not reasonable. The Underwriting Agreement uses the term "negligence," and it would not be reasonable to read this word to include strict liability. Metro was entitled to rely on its understanding of the word "negligence" to mean "failure to exercise due care," and any other meaning Stewart wishes to ascribe to this term is simply not tenable. At worst, the Agreement is ambiguous on this point, but this ambiguity must be resolved in Metro's favor, for purposes of this motion at least, because indemnity contracts are to be narrowly construed and because the Underwriting Agreement is a form contract that Stewart prepared.

There is clearly a question of fact as to whether Metro was negligent. Indeed, Stewart spent hundreds of thousands of dollars fighting the easement claim by Love on the ground that the document creating the easement had been misfiled and was not discoverable through a reasonable search of the title. The sworn testimony of Stewart's own senior underwriter is itself enough to raise a genuine issue of material fact.

---

[1] This Summary addresses only the Arnold Industries claim (fifth cause of action) and the Dean Clark claim (seventh cause of action). The argument sections on the remaining claims are very brief.

Further, even if Stewart had established that Metro was negligent under the Underwriting Agreement, the motion would still have to be denied because Stewart has not made a showing that its damages were reasonable and properly attributable to Metro.  Stewart had the chance to settle the entire Arnold matter very early on for only $72,000, and Arnold asked Stewart to take the settlement, but Stewart refused, and as a result Stewart ended up paying more than ten times that amount.  Importantly, Stewart did not tender the defense of the Love claim to Metro or involve Metro in any settlement decisions; as such, Metro cannot be forced to indemnify Stewart for what Stewart decided to pay in settlement unless Stewart proves actual liability and that the settlement was reasonable.  Stewart has done no such thing.  Further, there are triable issues of fact as to how much of Stewart's claimed damages are properly Metro's responsibility, since Stewart paid a substantial sum to Arnold to settle Arnold's bad faith claim against Stewart, which is clearly not Metro's responsibility.  Additionally, because the contract limits Metro's liability to losses caused by Metro's own negligence, fault must be apportioned with Stewart and with Salt Lake County.

Stewart's attorney fee claim must also be denied.  Stewart has presented no evidence that the fees were reasonable, or even what the fees were for.  Instead, Stewart has asserted, with no supporting documents, that Stewart spent over $287,000 in fees.  This is clearly not enough to support an attorney fee award, especially an award so big, and especially considering that a large portion of those fees were incurred because Stewart refused to settle the claim when it had the chance.

**Dean Clark Claim (Seventh Cause of Action)**

Stewart is not entitled to judgment as a matter of law on the Dean Clark ("Clark") claim. First, under the plain language of the Underwriting Agreement, Metro is only liable to indemnify Stewart for losses caused by Metro's negligence, fraud, or intentional act or omission. Stewart has not shown that Metro was negligent in issuing the Clark policy.

Stewart alleges that Metro is responsible for money paid by Stewart to its insured because Metro issued the Clark policy without excluding a railroad right-of-way. Stewart is not entitled to summary judgment on the Clark claim because Stewart has failed to produce evidence that its insured under the Clark policy suffered any damages as a result of the railroad right-of-way as opposed to other obvious reasons that were in no way Metro's fault.

Issues of fact regarding Stewart's negligence in handling the Clark claim also preclude summary judgment. Stewart never requested or obtained a correct appraisal of the value of the insured estate under the Clark title policy. Stewart incorrectly requested an appraisal of only a portion of the insured estate to determine the effect of the railroad right-of-way on that parcel. Furthermore, when the appraisal came back it contained errors which greatly increased the value of the effect of the railroad right-of-way but Stewart failed to notice these errors prior to settling with its insured for $90,000. Stewart notified Metro that it had settled with its insured and pro-vided Metro with a copy of the appraisal only after it paid its insured the full amount of the appraisal. Stewart's own employees later acknowledged that the appraised value was incorrect and was far higher than it should be. The errors in the appraisal were obvious and significant enough that Stewart's own employees considered filing a claim against the appraiser. Fault must therefore be apportioned to Stewart and the appraiser.

Stewart has acknowledged that Metro is not responsible for Stewart's negligence or the negligence of third parties, including appraisers hired by Stewart.  Stewart is not entitled to summary judgment because there are outstanding issues regarding Stewart's negligence: in assuming that the railroad right-of-way damaged its insured without any evidence to support this conclusion; by requesting an appraisal that was inconsistent with Stewart's obligations to its insured under the Clark policy; and for failing to carefully review its appraisal and identify the errors it contained prior to paying $90,000 to its insured.

Finally, as with the Arnold claim, Stewart did not tender the defense of the Clark claim to Metro or involve Metro in any settlement decisions; as such, Metro cannot be forced to indemnify Stewart for what Stewart decided to pay in settlement unless Stewart proves actual liability and that the settlement was reasonable.  Stewart has done no such thing.

## ARGUMENT[2]

### I.   STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ARNOLD INDUSTRIES CLAIMS (Fifth Cause of Action).[3]

Stewart's motion should be denied as it pertains to its claim for $738,132.61 in losses Stewart allegedly incurred in connection with the claim brought under the Arnold Industries ("Arnold") policy.  The Arnold claim involved an undiscovered (and undiscoverable) easement over the Arnold property for the benefit of property owned by Love.  After the dispute developed

---

[2] In addition to the reasons set forth herein, Metro maintains that Stewart's Motion for Summary Judgment should be denied for the reasons set forth in the Motion for Summary Judgment Metro filed with the Court on September 28, 2005, the memoranda filed in support of that motion, and the memoranda filed in opposition to Stewart's Cross-Motion for Summary Judgment dated November 18, 2005.

[3] Because of both the size of the Arnold claim and the number and importance of the legal issues implicated by that claim, Metro is addressing that claim first.  Stewart's remaining claims will be addressed in the same order in which Stewart presented them.

between Arnold and Love in 1996 over the existence of the easement, Stewart sued on Arnold's behalf (the Arnold-Love Case).  Stewart litigated the matter for six years, all the way to the Utah Supreme Court, arguing among other things that any easement was invalid against Arnold because Arnold lacked notice.  Stewart contended that the County Recorder had misfiled the deed purportedly granting the easement, and that the deed was not discoverable through a reasonable search of the property records.  Stewart's own Vice-President, Senior Underwriter, and District Manager even testified as such.

Arnold, however, did not want to litigate; in fact, Arnold had negotiated a settlement in 1998 that would have resolved the whole claim, but Stewart did not want to pay the $72,000 the settlement required.  Arnold informed Stewart that Stewart's refusal to resolve the Arnold-Love litigation was hampering Arnold's ability to sell its property, but Stewart decided to keep litigating anyway.  The Utah Supreme Court ultimately determined that Love did in fact have an easement over the Arnold property.  See Arnold Indus. v. Love, 63 P.3d 721 (Utah 2002).

Stewart's policy with Arnold required that if there was an undiscovered encumbrance on the property, Stewart was required to pay Arnold the diminution in value caused by the encumbrance.  Stewart obtained an appraisal stating that the easement diminished the value of the Arnold property by no more than $50,300 and sent Arnold a check for that amount.  When Arnold did not accept this as full compensation, Stewart initiated a declaratory judgment action (the Stewart-Arnold Case) regarding Stewart's liability under the policy.  Arnold counterclaimed, suing for breach of contract and for breach of the implied covenant of good faith and fair dealing, alleging damages from Stewart's failure to promptly settle the Arnold-Love Case, including the

loss of $400,000 in connection with a sale that fell through.  Arnold's counterclaim demanded damages, attorney fees, and interest.

In June 2004, Stewart settled Arnold's claim by paying Arnold an additional $400,000 for a release of all of Arnold's claims against Stewart, including the claim for breach of the implied covenant.  According to Stewart, Stewart also spent a total of $287,832.61 in attorney fees litigating the Arnold-related matters.  Thus, Stewart ended up spending $738,132.61 on a claim that Stewart could have settled years earlier for $72,000.

Stewart never told Metro that Stewart considered the claim to be Metro's responsibility under the Underwriting Agreement.  Nor did Stewart ever involve Metro in any settlement discussions or decisions concerning litigation strategy.  *After* spending the money, however, Stewart demanded that Metro repay Stewart every dollar.  Stewart's motion asserts that Stewart is entitled to this amount as a matter of law, regardless of the fact that Stewart's own expert swore under oath that the easement was not discoverable through a search of the public records, and even though Metro had nothing to do with Stewart's decision to refuse the $72,000 settlement *or* Stewart's decision to pay Arnold the extra $400,000 to settle Arnold's claims.

For the reasons set forth below, Stewart is not entitled to judgment.

**A.    Stewart has not established that Metro must indemnify Stewart for anything more than $2500, because Stewart has not shown that it suffered losses as a result of Metro's "negligence, fraud, or intentional act or omission."**

       1.    <u>The Underwriting Agreement limits Metro's indemnification liability to $2500 for losses "not due to [Metro's] negligence."</u>

Paragraph 3 of the Underwriting Agreement, sets forth the "Duties of Company." Subparagraphs A through C govern Metro's duties in issuing title policies; Subparagraph A covers the steps Metro must take to issue a policy, Subparagraph B sets forth the recordkeeping require-

ments, and Subparagraph C sets forth the reporting and payment requirements.  For the present

motion, Subparagraph A is the most important:

> A.    COMPANY shall conduct its business in a sound and ethical man-
> ner and shall issue title insurance policies, endorsements, binders and commit-
> ments *according to recognized practices and the rules and instructions given by*
> *UNDERWRITER or imposed by the Department of Insurance or other regula-*
> *tory body*.  All title policies must be based on a written report of title resulting
> from a search and examination of those public records, surveys and inspections
> relevant to the insurance afforded by such policies.  Where outside attorneys are
> used for examination, they shall act for and be paid by COMPANY, but shall be
> approved by UNDERWRITER.   Each title policy, binder, commitment and
> endorsement shall be on a form designated by UNDERWRITER and shall
> correctly reflect the status of title with appropriate exceptions as to liens, defects,
> encumbrances and/or objections disclosed by the search and examination of title.

(Underwriting Agreement, Add. Ex. 1, ¶ 3(A) (emphasis added).)  Thus, under Subparagraph A,

Metro must follow "recognized practices."  If not, Paragraph 5 explains what happens:

> A.    On each loss under a title policy issued pursuant to this Agreement
> *not due to the COMPANY's negligence or fraud*, COMPANY shall be liable to
> UNDERWRITER for the first $2,500.00 of such loss.  The term loss shall include
> the amount paid to or for the benefit of the insured as well as loss adjustment
> expense including any cost of defending the claim resulting in the loss.

> B.    On each such loss *due to the negligence, fraud, or intentional act*
> *or omission of COMPANY* or its employees, representatives, or agents, COM-
> PANY shall be liable to UNDERWRITER for the entire amount of such loss.
> Negligence as the term is used herein includes, but is not limited to the failure of
> the title plant, failure to discover or report any instrument of record affecting title,
> violation of escrow instructions, failure to follow UNDERWRITER's instructions,
> and the failure to prepare a title policy in a manner that properly reflects any
> instrument contained in the search of title.

(Id. ¶ 5(A), (B) (emphasis added).)

Under Paragraph 5, then, two different classes of liability exist:  strict liability and negli-

gence liability.  (Because Stewart admits that Metro did not commit fraud or other intentional

torts, those provisions are not relevant to this analysis.)  Under paragraph A, strict liability is

capped at $2500 per claim, while under Paragraph B, negligence liability extends to all losses caused by the negligence.  Negligence, of course, means the failure to exercise due care, or as explained in Paragraph 3(A), the failure to issue policies "according to recognized practices."

Stewart has failed to establish that Metro failed to exercise due care or follow recognized practices in issuing the title policy to Arnold Industries.  In fact, Stewart does not even *argue* that Metro failed to exercise due care.  And there is a very good reason for this:  The "corrective warranty deed" supposedly creating the Love easement was a "wild deed," misfiled in the records, such that the only way for someone to have found that easement would have been to search every single property record in the county.  Instead, Stewart suggests that because paragraph 5(B) of the Agreement states that negligence "includes" the "failure to discover or report any instrument of record affecting title," Metro is automatically liable for failing to discover such a document, *even if the document could not be found in the public records through reasonable and universally accepted searching methods*.  Stewart's position is absurd.

The plain language of the Agreement itself defeats Stewart's argument.  As noted above, paragraph 5(A) limits damages to $2500 for losses "not due to [Metro's] negligence."  The word "negligence" has a plain, universally understood meaning:  the failure to exercise due care, or in layman's terms, "carelessness."  <u>See, e.g.</u>, Merriam-Webster's Tenth Collegiate New Dictionary at 777 (10th ed. 1997) (negligence is the "failure to exercise the care that a prudent person usually exercises").  A reasonable person reading paragraph 5 would understand it to mean that if Metro does <u>not</u> act carelessly, Metro's exposure is limited to $2500.  As Stewart argues at length in its memorandum, a contract must be interpreted according to its plain meaning, and the plain meaning of "negligence" is *negligence*.

The reference in paragraph 5(B) that negligence "includes" the failure to discover a document affecting title, the failure of the title plant, etc., does not compel a ruling in Stewart's favor. This provision merely furnishes *examples* of ways in which a title agent may be negligent. Paragraph 5(B) states that one of the ways in which Metro may be held negligent, and thus subject to more than $2500 in liability, is by failing to discover a document affecting title. This does not mean, however, that failing to discover a document <u>automatically</u> subjects Metro to excess liability even when Metro was not negligent.

Indeed, Metro's interpretation of the Agreement is bolstered by the fact that Paragraph 3(A) of the Agreement, which sets forth Metro's duties in issuing title policies, states that Metro's duty is to issue such policies "according to recognized practices." As Stewart has admitted, this provision merely requires a title agent to adhere to industry standards in searching title records. (Storlie Depo., Add. Ex. 2, at 269:10-19.) This, of course, is essentially the same as a negligence standard, as negligence is commonly determined by referring to standards of practice. Under Utah law, a contract must be read as a whole. <u>See</u> <u>Gillmor v. Macey</u>, 121 P.3d 57, 65 (Utah App. 2005) (court must examine entire contract and all parts in relation to each other to give reasonable construction of contract as a whole.) Given that Paragraph 3(A) essentially adopts a negligence standard, and that Paragraph 5(B) uses the word "negligence," the only reasonable interpretation of the Agreement is that for Stewart to recover more than $2500 from Metro, Stewart must establish that Metro breached industry standards, i.e., failed to exercise due care.

The testimony of Karen Storlie, Stewart's 30(b)(6) witness, demonstrates the absurdity of Stewart's interpretation of the Underwriting Agreement. Ms. Storlie testified that under Stewart's interpretation of the Underwriting Agreement, the only way a title agent could avoid liability un-

der paragraph 5(B) would be to search every record in the County Recorder's office.  (Storlie Depo. at 235:16 - 236:11.)   Ms. Storlie also testified, however, that paragraph 3(A) of the Underwriting Agreement does *not* require a title agent to go to such extreme lengths, because "recognized practices" do *not* require an agent to search every record.  (Storlie Depo. at 269:20-24.)  Thus, under Stewart's own testimony, Metro could fully satisfy its contractual duties and still be liable for losses due to an undiscoverable document affecting title.

Further, Stewart's own conduct while the Arnold claim was pending shows that even Stewart did not interpret paragraph 5(B) to impose liability on a title agent for every claim based on an undiscovered document.  Stewart knew as early as April 1996 that the easement claim was based on a document appearing in the property records that had not been disclosed in the title policy.  Yet Stewart did not tell Metro that it was holding Metro responsible for the claim.  In fact, for *years*, Stewart regularly sent Policy Loss Reports to Metro stating that the Arnold claim was <u>not</u> billable to Metro under the Underwriting Agreement.  (<u>See</u> Policy Loss Reports, Add. Ex. 18; <u>see also</u> Storlie Depo. at 411:9 - 415:7 (admitting that Stewart knew for years that Arnold claim was based on claim of missed deed yet did not indicate that claim was billable to Metro). This designation means that Stewart did <u>not</u> consider the claim billable to Metro under the Underwriting Agreement.  (Storlie Depo. at 180:1-9.)  In fact, on July 26, 2004, after Stewart had fully settled with Arnold, Stewart issued a Policy Loss Report that *still* indicated that the claim was not billable.  (Policy Loss Report, July 26, 2004, Add. Ex. 28.)

Stewart did not decide that the Arnold claim was billable to Metro until after Stewart purportedly spent hundreds of thousands of dollars on the claim.  A fact finder could certainly infer that if Stewart truly believed that Metro was liable for all losses due to any undiscovered docu-

ment affecting title, regardless of negligence, Stewart would have not have told Metro that the claim was not billable.

It would be inappropriate to interpret the Underwriting Agreement to impose strict liability when the Agreement clearly requires "negligence."  It would also be inappropriate to make Metro pay when Metro did ***not*** breach its duty under the Agreement to investigate and issue title policies according to recognized practices.  Accordingly, it would be inappropriate to hold as a matter of law that Metro is liable to indemnify Stewart for the Arnold claim.

As the non-movant, Metro need not establish that Stewart's proffered interpretation of the Agreement is unreasonable.  Rather, Metro need only show that its *own* interpretation *is* reasonable.  If an agreement is subject to two reasonable or tenable interpretations, then the agreement is ambiguous, and the Court must consider extrinsic evidence in determining the meaning actually intended by the parties, rendering summary judgment inappropriate.  E.g., R & R Energies v. Mother Earth Indus., Inc., 936 P.2d 1068, 1074 (Utah 1997) (quoting Faulkner v. Farnsworth, 665 P.2d 1292, 1293 (Utah 1983)) ("'[A] motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended.'"); see also Canopy Corp. v. Symantec Corp., 395 F. Supp. 2d 1103, 1107-08 (D. Utah 2005) (Kimball, J.).

Metro maintains that its interpretation of the Agreement is the only reasonable interpretation.  It is not reasonable for Stewart to suggest that "negligence" really means "strict liability." It is likewise not reasonable for Stewart to suggest that Metro must pay damages when Metro did not breach any duty under the contract.  Further, the Underwriting Agreement, as a contract of indemnity, is to be strictly construed; there is no duty to indemnify against a loss unless the

indemnity contract makes that responsibility clear.  See Allied Hotels Co. v. H & J Constr. Co.,
376 F.2d 1, 2 (10th Cir. 1967) ("It is well established that courts may not read into an indemnity
contract that which does not actually appear in it or which is not warranted by a reasonable
interpretation thereof. The language employed must clearly and definitely show an intention to
indemnify against the loss or liability involved."); see also CIG Exploration, Inc. v. Hill, 824 F.
Supp. 1532, 1542 (D. Utah 1993) (Utah strictly construes indemnity contracts.).  Also, because
the Underwriting Agreement is a form contract Stewart prepared, conflicting, ambiguous, or
uncertain terms must be construed against Stewart.  See, e.g., Sears v. Riemersma, 655 P.2d
1105, 1107 (Utah 1982) ("The well-established rule in Utah is that any uncertainty with respect
to construction of a contract should be resolved against the party who had drawn the
agreement."); see also Express Recovery Servs., Inc. v. Rice, 125 P.3d 108, 109, n. 1 (Utah App.
2005).  Thus, if the Agreement says that Metro is liable only for its "negligence, fraud, or other
intentional act," the Underwriting Agreement should be interpreted to mean exactly that, even if
Stewart believes a *different* provision imposes strict liability.

The evidence is undisputed that Stewart never told Metro that the "negligence, fraud, or
other intentional act" language of paragraph 5(B) actually imposed strict liability on Metro for
certain losses.  Instead, Metro understood "negligence" according to its plain meaning.  And, as
noted above, Stewart's own treatment of the Arnold claim as "not billable" shows that Stewart
agreed with Metro's interpretation.  Thus, Metro asks the Court to rule that as a matter of law, the
*only* reasonable interpretation of the Agreement is that Metro is not liable for more than $2500 in
losses unless Stewart proves that Metro breached its duty of due care or failed to follow recog-
nized practices in searching the records and issuing the Arnold policy.

At the very least, however, the Court should rule that Metro's interpretation of the Underwriting Agreement is *a* reasonable interpretation.  That is, it is at least *reasonable* to conclude that if the Agreement specifically states that Metro's liability is limited to $2500 unless the loss is caused by Metro's "negligence, fraud or other intentional act or omission," then Stewart must prove that Metro committed negligence, fraud, or another intentional act or omission.  As such, the Agreement must be construed in Metro's favor for purposes of this motion.

      2.     <u>Stewart has not established as a matter of law that Metro was negligent or committed fraud or another intentional act</u>.

Because the Underwriting Agreement caps Metro's indemnification exposure at $2500 for losses not due to Metro's negligence or fraud -- or, more importantly, because it is at least *reasonable* to read the contract that way -- Stewart cannot be granted summary judgment on the Arnold claim unless Stewart establishes as a matter of law that Metro was negligent, i.e., that Metro failed to exercise due care (or follow "recognized standards").  As noted above, the argument section of Stewart's memorandum does not even address whether Metro exercised due care; it (wrongly) assumes that the mere fact that Metro did not discover a recorded document automatically subjects Metro to liability.  Further, Stewart's Statement of Facts does not point out any errors in Metro's title search or suggest what Metro should have done to find the easement.[4]

---

[4] Stewart asserts in its Statement of Facts that in *Arnold Industries v. Love*, the Utah Supreme Court stated that "an investigation of reasonable diligence" would have provided actual notice of the easement.  (See Stewart Mem. at 16, Proposed Fact 63 (quoting <u>Arnold Indus.</u>, 63 P.3d 721, 730).)  With all due respect to the Utah Supreme Court, however, that statement is not binding on Metro, because Metro was not a party to that case, nor did Stewart tender the defense of the claims in that action to Metro.  <u>See, e.g.</u>, <u>Sac and Fox Nation of Missouri v. Pierce</u>, 213 F.3d 566, 580 (10th Cir. 2000) (ruling in prior action is not binding on person that was not a party to that action); <u>Albion-Idaho Land Co. v. Naf Irr. Co.</u>, 97 F.2d 439, 444 (10th Cir. 1938).

Additionally, the case did not include or address any issues concerning how a title company should search county property records in connection with the issuance of a title policy.  Thus, the Utah Supreme Court's statements are not relevant to Stewart's claim against Metro and are insufficient to

As the plaintiff, Stewart has the burden of proving every element of its claim; thus, to meet its initial burden on summary judgment, Stewart must present evidence that would compel a fact finder to conclude that Metro was negligent.  Stewart has presented no such evidence.

Even if Stewart had presented evidence that Metro was negligent, however, the motion would still have to be denied, because there is at least a genuine issue of material fact as to whether Metro failed to exercise due care.  The document purportedly granting an easement over the Arnold property was not indexed to the Arnold property, but *only to the Love property*. Thus, the deed conveying the easement was a "wild deed," and no matter how carefully or exhaustively Metro searched the records indexed to the Arnold property, it would not have found the deed conveying the easement.[5]

In fact, Arlen Taylor, Stewart's Vice-President, Region "F" Senior Underwriter, and District Manager, with 30 years of experience in the title business, testified under oath that he personally reviewed the title records affecting the Arnold property and that based on his examination, "there exists no deed, grant, or other document in the chain of title to the Arnold Property which states, recites, or reflects, that the Arnold Property is subject to a right-of-way or easement in favor of [the] Loves, as claimed by Defendants Love in this lawsuit."  (Arlen Taylor Aff., December 5, 1997, Add. Ex. 24, at p. 7, ¶ 17.)  Mr. Taylor also testified that "there exists no document, deed, or grant, in the Love chain of title, which recites, describes, or references, any

---

establish that Metro failed to exercise due diligence in searching the records and issuing the Arnold policy.

[5] In holding that Arnold Industries had constructive notice of the easement, the Utah Supreme Court relied heavily on the fact that the easement "was in open and obvious use" by Love's predecessor. See 63 P.3d at 729-30 ¶¶ 30-31.  Stewart admits, however, that title agents are usually not expected to visually inspect properties but are entitled to rely on their searches of the public records.  (See Storlie Depo., Add. Ex. 2, at 151:12-18, 163:9 - 164:19.)

easement, or right-of-way, over and across the Arnold Property." (Id. ¶ 18.)  Finally, and most importantly, *Mr. Taylor testified that a reasonable search of the records would not have uncovered the deed that contained the easement*:

> Based upon my 30 years experience and knowledge of the title insurance busi-
> ness, and of my experience in the examination of tens of thousands of chains of
> title to tens of thousands of properties, ***a search of the Arnold Property as of July
> 15, 1993, the date Arnold Industries took title, would not, and did not reveal any
> easement across the Arnold Property as claimed by [the] Loves***.

(Id. at p. 10, ¶ 30 (emphasis added).)   If Stewart's own senior underwriter/district manager testified that the records did not reveal the easement, then Stewart cannot in good faith contend that Metro was negligent as a matter of law for failing to find it.

Indeed, Stewart's own actions show that Metro was not negligent in failing to find the easement.  In the Arnold-Love litigation, Stewart spent six years contending that the easement was invalid against Arnold because a reasonable search of the records would <u>not</u> have revealed it.  Stewart also reviewed and approved of a claim filed on Arnold's behalf against Salt Lake County, arguing that the failure to discover the deed was caused by the County's negligence. (Storlie Depo., Add. Ex. 2, at 296:22 - 298:1.)  And, as explained above, Stewart sent Metro the Policy Loss Reports stating that the Arnold matter was "not billable."  (Al Newman Decl., Add. Ex. 5, ¶ 17; <u>see also</u> Add. Ex. 18.)  These actions are inconsistent with Stewart's claim that Metro was negligent in failing to discover the easement.

Whether a party was negligent is a question of fact, unsuitable for resolution on summary judgment unless the facts can only be interpreted one way.  Peck v. Horrocks Engs. Inc., 106 F.3d 909, 952 (10th Cir. 1997); MacKay v. 7-Eleven Sales Corp., 995 P.2d 1233, 1236 (Utah 2000) ("Questions relating to negligence . . . are generally for the trier of fact, court or jury, to

determine.").  Metro respectfully submits that the record does not support a determination that Metro was negligent as a matter of law.  Accordingly, because Stewart has not established that the Arnold claim constitutes a loss "due to the negligence, fraud, or other intentional act" of Metro, Stewart is not entitled to summary judgment on that claim.

      **B.**      **Stewart has not established that Metro was obligated to indemnify Stewart for the amounts Stewart claims to have paid as a result of the Arnold claim.**

Stewart's motion must also be denied because Stewart has not established that Metro's duty to indemnify, if any, extends to the full $738,132.61 Stewart claims.  Stewart has not even come close to the sort of showing that is required to establish such a claim.  The *only* evidence Stewart cites to support its damages is one sentence in Karen Storlie's Declaration, in which Ms. Storlie testifies, without any substantiation or reference to any documents, that "[a]s a result of the Arnold Claim and an unfavorable ruling pertaining to Metro's lack of diligence from the Utah Supreme Court, Stewart incurred a loss of $450,300 in settlement with Arnold and $287,832.61 in attorneys' fees to defend Arnold and settle the claim."  (Storlie Decl. ¶ 47, cited in Stewart Mem. at p. 17, ¶ 64.)  Stewart has presented no evidence of what Stewart spent the money on, why the money was spent, or what it accomplished.  Without such evidence (and more), Metro cannot be held liable as a matter of law for either the settlement payment or the attorney fees.

      1.      <u>Stewart has not established that Metro is liable for the $450,300 Stewart paid to Arnold</u>.

            a.      <u>Stewart has not shown that Stewart was actually liable to Arnold for this amount or that the settlement was reasonable</u>.

The evidence unambiguously shows that Stewart grossly mishandled the entire Arnold matter:  First, Stewart decided to pursue years of expensive litigation regarding the existence and enforceability of the purported easement, even though Stewart could have resolved the whole

claim in 1998 for $72,000.  Second, after wasting hundreds of thousands of dollars on litigation, Stewart agreed to pay Arnold over $450,000 to settle Arnold's claim against Stewart, even though (1) Stewart's policy with Arnold limited Stewart's liability to the diminution in value caused by the easement, and (2) Stewart's own appraisal of the Arnold property revealed that the easement lowered the value of the Arnold property by, at most, $50,300 (Arnold Appraisal, Add. Ex. 17, at STGC-000367).  Karen Storlie's assertions are not enough to make Metro liable for these losses.

Stewart takes the position that every single dollar Stewart chose to spend in connection with the Arnold matter is Metro's responsibility, regardless of what Stewart spent it for.  Ms. Storlie testified that Stewart considers Metro liable for all losses, including those that Stewart incurred unreasonably.  (Storlie Depo., Add. Ex. 2, at 288:4 - 289:3, 292:13 - 293:1.)  Stewart considers Metro to be liable for losses that result from Stewart's own actions in handling a claim (Storlie Depo. at 293:18-22), amounts Stewart pays by mistake (Storlie Depo. at 333:5 -335:18), losses caused by third persons (Storlie Depo. at 293:18-22), losses resulting from incorrect information Stewart gives to its own appraiser (Storlie Depo. at 456:1 - 457:7), and losses resulting from wrong decisions made in handling a lawsuit.  (Storlie Depo. at 457:9-12.)  Stewart considers Metro responsible for all $738,000+ incurred in the Arnold matter even if Stewart could have settled the matter for one-tenth of that.  (Storlie Depo. at 457:13-17.)  In fact, Stewart refused to even acknowledge that it had a duty to mitigate its damages.  (Storlie Depo. at 339:12-22, 509:16 - 510:12.)

Further, Stewart considers Metro to be liable for Stewart's own reckless handling of the case even though Stewart did *not* involve Metro in the handling of the Arnold matters.  Stewart

admits that it did not give Metro the opportunity to take over either of the Arnold claims or to participate in settlement discussions, nor did Stewart keep Metro apprised of the status of those claims.  (Storlie Depo. at 284:13 - 285:12, 409:11 - 410:18.)  Metro had no input on selecting counsel for the Arnold claim nor were any communications sent to Metro regarding the claim. (Storlie Depo. at 284:13-15.)  Stewart admits that even when Stewart was in a dispute with Arnold over settling the easement claim for $72,000, Stewart did *not* contact Metro, tell Metro that Stewart considered Metro ultimately responsible for the claim, or ask Metro whether it would like to contribute to the settlement.  (Storlie Depo. at 284:13 - 287:12.)  (Once again, the entire time the Arnold claims were proceeding, Stewart was sending Metro Policy Loss Reports stating that the claim was not billable to Metro.)  Stewart admits that its policy is not to involve agents in title claims or allow them input in claim-handling decisions; sometimes agents might not even find out about a claim until it has been resolved.  (Storlie Depo. at 73:11-19, 75:17 - 81:19.)  Stewart's position is that it may make all the decisions and then just stick the agent with the bill.  (Storlie Depo. at 80:13 - 81:19.)

It is universally recognized, however, that a would-be indemnitor is not at the indemnitee's mercy as Stewart claims.  Instead, if a would-be indemnitee settles a claim without involving the indemnitor, the indemnitee may not recover from the indemnitor unless the indemnitee proves (1) that he or she was actually liable to the claimant <u>and</u> (2) that the settlement was reasonable.  Stewart, obviously, has made no such showing here, and as such Stewart is not entitled to summary judgment requiring Metro to pay Stewart $738,132.61.

The principles governing indemnitee-indemnitor obligations are most succinctly summarized in the following discussion from C.J.S.:

Where the indemnity clause in question is silent on certain issues, such as the issue of tender and notification before settlement, or where the indemnitee does not give the indemnitor an opportunity to refuse, pass upon, or participate in the settlement, then equitable principles of indemnity apply.

Under equitable principles of indemnity, ***in order for a settling indemnitee to support his claim, he must prove actual liability to the original plaintiff and that the amount paid in settlement was reasonable.*** In such case, to avoid having to prove actual liability, ***the indemnitee should offer the indemnitor before any settlement is concluded the choice of approving the settlement or taking over the indemnitee's defense.***

If the indemnitor refuses to approve the settlement or take over the defense, then the indemnitee will only be required to show potential liability to the original plaintiff to support his claim for indemnity. There is no rigid requirement that the indemnitee offer the above precise choice to the indemnitor, but ***the primary concern in such case is fairness to the indemnitor. Thus, if it can be shown that the indemnitor was afforded substantially the same protection that such choice affords, then the indemnitee need only show potential liability.***

42 C.J.S. Indemnity § 24, at 113-14 (1990) (emphasis added, footnotes omitted).[6]

On the other hand, if the indemnitee tenders the defense of the claim to the indemnitor, or if the indemnitee gives the indemnitor the chance to approve a settlement, the indemnitee need only show *potential* liability to recover against the indemnitor. Even then, however, the indemnitee still must show that the settlement was *reasonable*:

Generally, to recover under an indemnity agreement, the settling indemnitee need only show potential liability to the original plaintiff, and the reasonableness of the settlement between himself and the original plaintiff, and that it was made in good faith. ***The fact finder generally must evaluate the reasonableness of the settlement by comparing the nature of the injury and the damages incurred to the size of the settlement, and the good faith of the settlor by evaluating the probability that it would have been held liable.***

Where the agreement provides for indemnity against liability under specified circumstances, and the party seeking indemnity settles without a judicial finding of liability, he must prove the existence of his liability in a suit against the indemnitor, unless the indemnitor had a duty to defend. If the indemnitor had a

---

[6] The sections of C.J.S. cited in this memorandum are attached hereto as Exhibit A.

duty to defend and he breaches that duty, then the indemnitor will be bound by a reasonable settlement of the claim

> Thus, in those situations where the party having the duty to indemnify has been notified or made a party to the underlying proceedings and given an opportunity to participate in the settlement negotiations, the indemnitee should not be required to prove the plaintiff's actual ability to recover the amount paid in settlement so long as the indemnitee proves that he was potentially liable to the plaintiff.

Id. (emphasis added, footnotes omitted).

The Appellate Division of the New York Supreme Court has explained that Stewart's position is untenable because such an approach segregates the decisionmaker from the ultimately responsible party, leaving an indemnitor insufficient protection and encouraging waste:

> The explanation for the higher requirement that an indemnitee, who has not given notice, or who has rejected defense by the indemnitor, establish that he had been liable to the claimant stems from the fact that ***his action with regard to the claim is completely free of control by the indemnitor***.  Since, under such circumstances, the indemnitee knows or believes that any financial responsibility he undertakes is likely to fall ultimately on the indemnitor, he is not inhibited, except by the barest self-restraint.  This is an insufficient protection for an indemnitor; and, as a consequence, ***the indemnitee acts at his own risk that later he will be able to establish that the payment he made was one he had to make.***  Needless to say, even this is not an absolute test.  He meets his burden if he shows, by satisfying the finder of the facts by the preponderance of the evidence or other appropriate level of proof, that he would have been liable.

Feuer v. Menkes Feuer, Inc., 187 N.Y.S.2d 116, 122-23 (App. Div. 1959) (emphasis added).

While there is little Utah law directly on point, there can be little doubt that these principles would be adopted by a Utah court, given that these principles are so widely accepted. Thus, for example, the Tenth Circuit has described the state of the law as follows:

> ***Ordinarily, to sustain a claim upon an indemnity contract such as we have here, it is necessary for the indemnitee to prove legal liability to the injured party.***  However, in Oklahoma and elsewhere in indemnity cases, where the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, ***then*** the indemnitee is in full charge of the matter and may make a

- 20 -

good faith settlement without assuming the risk of being able to prove absolute
legal liability or the actual amount of the damages.

Chicago, R.I. & P.E. Co. v. Dobry Flour Mills, 211 F.2d 785, 788 (10th Cir. 1954) (emphasis

added).  In Dobry, the indemnitee demanded that the indemnitor take over the defense, and that

if it did not, the indemnitee would settle the claim and seek full recovery from the indemnitor,

and the indemnitor refused to accept liability.  Thus, the more liberal "potential liability"

standard applied, but the court stressed that even under this standard, the indemnitee still had to

prove that the settlement was reasonable:

> On this subject, the only question which should have been submitted to the jury
> was *whether the Railroad had made a reasonable, prudent, and good faith
> compromise and settlement*.  In determining whether the settlement was made in
> good faith, *the jury should consider the likelihood of recovery by Fruit against
> the Railroad and the reasonableness of the amount of the settlement*, but a prior
> judicial determination of either question is not necessary.

Id. at 788 (emphasis added).  See also Grand Trunk Western R. v. Auto Warehousing Co., 686

N.W.2d 756, 763 (Mich. App. 2004) ("Two general principles of law, applicable to contractual

indemnity in this context, are well-established.  First, if an indemnitee settles a claim against it

without seeking the approval of, or tendering the defense to, the indemnitor, then the indemnitee

must prove its *actual* liability to the claimant to recover from the indemnitor.  However, the in-

demnitee who has settled a claim need show only *potential* liability if the indemnitor had notice

of the claim and refused to defend."); id. at 764 (even under potential liability standard, "the

indemnitee must show that the fact situation of the original claim is covered by the contract of

indemnity and that the settlement is reasonable"); Atlantic Richfield Co. v. Interstate Oil Trans-

port Co., 784 F.2d 106, 110-112 (2d Cir. 1986) (reversing order holding indemnitor liable for

settlement where indemnitee did not seek indemnification or inform indemnitor of settlement

until night before settlement was finalized); <u>Burlington Northern R. Co. v. Stone Container Corp.</u>, 934 P.2d 902, 906-07 (Colo. App. 1997) (when indemnitor refuses to defend claim, indemnitee must prove "that it was potentially liable to the claimant and that the settlement amount was reasonably related to the liability exposure and the employee's injuries"); <u>see generally</u> 41 Am. Jur. 2d <u>Indemnity</u> § 27 (2005).  Additional cases adopting and applying these principles are cited in the footnote.[7]

Stewart cannot avoid these equitable principles by claiming that the Underwriting Agreement did not expressly require Stewart to establish actual liability and reasonable settlement, because these principles are implied in all indemnification contracts.  <u>See, e.g.</u>, 42 C.J.S. <u>Indemnity</u> § 24, at 114 (explaining that equitable principles of indemnity apply "[w]here the indemnity clause in question is silent on certain issues, such as the issue of tender and notification before settlement").  Indeed, in the cases cited above, the equitable "actual liability-potential liability" standard was found applicable even though the indemnity provisions in those cases were quite broad.  <u>See, e.g.</u>, <u>Dobry Flour Mills</u>, 211 F.2d at 785 (contract required indemnitor to indemnify "for loss, damage or injury from any act or omission" of the indemnitor); <u>Grand Trunk Western</u>, 686 N.W.2d at 762; <u>Burlington Northern</u>, 934 P.2d at 905.

---

[7] <u>See also</u> <u>Conoco, Inc. v. BOH Bros. Constr.</u>, 191 F.R.D. 107, 114 (W.D. La. 1998) ("settlement must be reasonable before indemnity is owed."); <u>Consolidated Rail Corp. v. Ford Motor Co.</u>, 751 F. Supp. 2d 674, 675 (E.D. Mich. 1990) (where indemnitee seasonably tenders defense and indemnitor refuses such tender, indemnitee must show that the settlement was reasonable.); <u>Stone Bldg. Co. v. Star Elec. Contractors, Inc.</u>, 796 So. 2d 1076, 1090 (Ala. 2000) ("general rule is that, if indemnity is sought against an indemnitor without notice of either the original suit or of the settlement by the indemnitee, then the indemnitee has the burden of establishing that it was actually liable to the plaintiff and that the settlement was a reasonable one."); <u>Pan American Petroleum Corp. v. Maddux Well Service</u>, 586 P.2d 1220, 1225 (Wyo. 1978) (regardless of whether indemnitee must show that it was potentially or actually liable to third party to collect on its indemnity claim from indemnor, the settlement must be reasonable); <u>McClure v. Deerland Corp.</u>, 585 A.2d 19, 22 (Pa. Super Ct. 1990) (indemnitee must establish the right to indemnification including the reasonableness of settlement).

Utah law recognizes that "[w]hen one party to a contract retains power or sole discretion in an express contract, it must exercise that discretion *reasonably and in good faith*." Cook v. Zions First Natl. Bank, 919 P.2d 56, 60 (Utah App. 1996); see also Eggett v. Wasatch Energy Corp., 94 P.3d 193, 198 (Utah 2004) ("Broadly speaking, the more leeway a party has under terms of a contract, the more contracting parties may invoke the protections of the covenant of good faith and fair dealing in the exercise of that discretion."). As noted above, Stewart claims that the Underwriting Agreement gives Stewart absolute discretion to decide what to pay on a claim (and, therefore, how much Metro must pay on that claim). If Stewart does in fact have such discretion, then Stewart is obligated to exercise that discretion reasonably, which means that Stewart must act reasonably in handling a claim for which it seeks indemnity from Metro.[8]

Stewart's argument that its "sole duty" was to the insured is nothing but a red herring. (See Stewart Mem. at 29-31.) Metro does not assert that Stewart should have taken any actions that would have prejudiced Stewart's insured. In fact, Stewart's insured, Arnold, *wanted* Stewart to resolve the Love claim in March 1998 instead of letting litigation drag on for another four years. (See Add. Ex. 31 - 33.) It was Stewart's choice, not Arnold's to continue to litigate when an inexpensive solution was within reach. Arnold, Stewart, *and* Metro would have been better served if Stewart had settled the Love claim when it had the chance. There is no conflict

---

[8] Stewart's assertion that an indemnitee need not notify an indemnitor of a claim misses the point. (See Stewart Mem. at 36 (quoting Rothey v. Walker Bank & Trust Co., 754 P.2d 1222, 1224 (Utah 1988).) As support for that proposition, Rothey cited 42 C.J.S. Indemnity § 14 (1944). That principle has a corollary: "If the indemnitee fails to notify the indemnitor, he proceeds at his own risk with regard to any judgment or settlement that may ultimately ensue, and he must establish that he would have been liable or was actually liable, and that there was no good defense to liability." 42 C.J.S. Indemnity § 25, at 115-16 (1991). In fact, the Rothey court expressly noted that Rothey was "not a case where the indemnitee attempted to conclusively bind the indemnitor to pay amounts, costs, or fees which were determined and fixed in a prior action but of which the indemnitor had no knowledge or opportunity to litigate." Rothey, 754 P.2d at 1224. Here, of course, Stewart is attempting to do exactly that.

between Stewart's duty to its insured and Metro's assertion that Stewart can only recover damages if it acted reasonably.[9]

The law is clear:  An indemnitee who pays a claim without involving the indemnitor acts at its own risk and may not recover indemnity unless the indemnitee establishes *both* that the indemnitee was actually liable to the claimant *and* that the settlement was reasonable.  Even if the indemnitor is notified and refuses a tender, the indemnitee faces a more relaxed "potential liability" standard, but the indemnitee still must establish that the settlement was reasonable.  An indemnitee does not have free rein to bind the indemnitor to any settlement the indemnitee chooses to make.  In the present case, Stewart admits that it did not involve Metro in Stewart's settlement discussions with Arnold or tender the defense of the claim to Metro.  Nor did Stewart inform Metro before rejecting the $72,000 settlement in 1998 or paying the $450,300 settlement in 2004.  In fact, Stewart did not even tell Metro that Stewart was seeking indemnification until the case was closed.  Accordingly, Metro is not liable to Stewart unless Stewart establishes actual liability and a reasonable settlement.  Since Stewart has not made such a showing, Stewart clearly is not entitled to judgment as a matter of law.

        b.    <u>Stewart has not shown that the entire $450,300 constituted a "loss under the policy" that was "due to" Metro's negligence</u>.

In addition to the longstanding equitable principles governing indemnity contracts, the plain language of the Underwriting Agreement defeats Stewart's claim that Metro is liable for

---

[9] Further, the $450,300 Stewart paid was to its insured, *after* the third-party claim had been concluded and after Stewart and Arnold had sued each other under the policy.  At that point, Stewart was fully within its rights to litigate the amount it owed Arnold under the policy.  <u>See, e.g.</u>, <u>State Farm Mut. Auto Ins. v. Clyde</u>, 920 P.2d 1183 (Utah 1996) (auto insurer sued insured seeking declaration as to whether insureds were entitled to recover underinsured motorist benefits.)  Thus, Metro's position that it is not liable for Stewart's overpayment to Arnold does not conflict with any duties Stewart may have owed to Arnold.

every dollar Stewart chose to spend on the Arnold claim.  Rather, the Underwriting Agreement

states that Metro is only liable for a loss that is (1) "under a title policy" and (2) "due to the

negligence, fraud, or intentional act or omission of COMPANY [Metro] or its employees, repre-

sentatives, or agents."  (Underwriting Agreement, Add. Ex. 1, ¶ 5(A), (B).)  Stewart has not

satisfied either element.

> i.    <u>There is at least an issue of fact as to how much of the
> $450,300 was a "loss under the policy."</u>

Once again, the sole evidence supporting Stewart's claim for $450,300 is Karen Storlie's

unsupported testimony that Stewart "incurred a loss of $450,300.00 in settlement with Arnold,:

purportedly "[a]s the result of the Arnold Claim and an unfavorable ruling pertaining to Metro's

lack of diligence from the Utah Supreme Court."  (Storlie Decl. ¶ 47.)  This "evidence" is insuf-

ficient to support a judgment for Stewart, because the mere fact that Stewart allegedly incurred a

loss "as a result" of a claim is not enough to establish that the loss was "under a title policy."

One can imagine many ways in which Stewart could have suffered a loss as a result of a claim,

such as various aspects of consequential damages, but those losses would not necessarily be

suffered under the policy itself.  Ms. Storlie's conclusory testimony forces us to speculate as to

what losses Stewart actually suffered, how it suffered them, and whether those losses fall within

the language of the Underwriting Agreement.  Thus, Stewart has not even met its initial burden

of establishing that it suffered any compensable losses.

In fact, the record shows that at least some of Stewart's losses were <u>not</u> under the title

policy itself.  Under the Stewart-Arnold policy, Stewart was liable to Arnold only for "the differ-

ence between the value of the insured estate or interest as insured and the value of the insured

estate or interest subject to the defect, lien, or encumbrance insured against by this policy"

(Arnold Policy, Add. Ex. 27, at ¶ 7(a)(ii).)  When Arnold sued Stewart, however, Arnold sought not only the diminution of value, but also damages, interest, and attorney fees for Stewart's failure to handle the Love claim properly.  (See Stewart-Arnold Counterclaim, Add. Ex. 14, at ¶¶ 14-24 (alleging that Stewart's failure to settle the Love claim "promptly" impeded Arnold's ability to sell the property and caused the loss of $400,000 in relation to a letter of credit issued to extinguish the easement).)  Critically, under Utah law, an insured's claim against its insurer for failing to properly handle a third-party claim is a *tort* claim.  See, e.g., Beck v. Farmers Ins. Exch., 701 P.2d 795, 799 (Utah 1985) (citing Ammerman v. Farmers Ins. Exch., 430 P.2d 576, 578-79 (Utah 1967)); see also Campbell v. State Farm Mut. Auto Ins. Co., 840 P.2d 130, 138 (Utah App. 1992) ("In the third-party context, on the other hand, an insured may state a cause of action *in tort* for an insurer's breach of its obligations.").

The Ammerman court expressly stated that "the cause of action for bad faith, though arising because of the policy, *is not, strictly speaking, an action on the policy*."  Ammerman, 430 P.2d at 578 (emphasis added).  Thus, Metro is not liable for losses Stewart incurred in defending against Arnold's claim for breach of the implied covenant.

Karen Storlie acknowledged in her deposition that by entering into the Settlement Agreement with Arnold, Stewart obtained a release of all of Arnold's claims against Stewart, including the claim for breach of the implied covenant.  (Storlie Depo. at 467:18 - 469:24, 553:12 - 554:17, 572:15 - 573:12.)  The settlement, however, was not broken down into what amounts were paid for diminution in value and what Stewart was paying for damages for breach of the implied covenant, interest, or attorney fees.  (Id.)  Without evidence of how much Stewart actually paid for diminution in value and was Stewart paid to release Arnold's other claims, there is no basis to

determine what, if anything, Metro would owe Stewart; any conclusion would be nothing but speculation.[10]   It is Stewart's burden to present evidence establishing its damages, and damages cannot be awarded based only on speculation.   See Atkin Wright & Miles v. Mountain States Telephone & Telegraph, 709 P.2d 330, 336 (Utah 1985) (Plaintiff must prove "the amount of damages. . . . "[t]he evidence must do more than merely give rise to speculation."); see also Jaeco Pump Co. v. Inject-O-Meter Mfg. Co., 467 F.2d 317, 319 (10th Cir. 1972) (Damages are not to be awarded whenever the evidence surrounding them is uncertain, contingent or speculative.).

In fact, the record contains strong evidence that the bulk of the settlement was *not* attributable to Arnold's claim under the policy for diminution in value.  As noted above, Stewart's appraisal determined that the easement diminished the value of the Arnold property by no more than $50,300.  Stewart therefore paid Arnold that amount on May 29, 2003.  (See, e.g., Arnold-Stewart Counterclaim, Add. Ex. 14, ¶ 27; Disbursement Request, Add. Ex. 29.)  Then Stewart initiated the declaratory judgment action asking the court to rule that Arnold had been fully compensated.  (Arnold-Stewart Complaint, Add. Ex. 30.)  In its counterclaim, Arnold alleged that it suffered damages due to Stewart's unreasonable choice to keep litigating the claim, and Arnold specifically alleged that it lost exactly $400,000 due to the failure of a proposed sale.  (Arnold-Stewart Counterclaim, Add. Ex. 14, ¶¶ 23-24.)   Stewart ultimately settled that action by paying Arnold another $400,000.  (See Storlie Decl. ¶ 47 (total payment was $450,300).)   It would

---

[10] The Colorado Court of Appeals recently explained how a trial court should approach a request for indemnity where a single settlement is paid to resolve two claims, where the indemnitee has a right of indemnification for only one of them.  See Burlington Northern R. Co. v. Stone Container Corp., 934 P.2d 902, 906-08 (Colo. App. 1997).  The court held that to determine the extent of the indemnification obligation (if any), "the fact finder must first determine whether the entire settlement was reasonable.  If so, the fact finder must next determine what percentage of the total damages was attributable to the first claim and then multiply that percentage times the actual total settlement amount to determine the indemnitor's liability."  Id. at 906.  Here, of course, Stewart's failure to support its motion with the proper evidence prevents the Court from making *either* determination.

certainly be reasonable to infer that Stewart's $400,000 additional payment was largely attributable, if not entirely attributable, to the implied covenant claim.

Stewart cannot be awarded summary judgment that Metro owes $450,300 for the Arnold claim unless Stewart establishes as a matter of law that the entire $450,300 constitutes a "loss under a policy issued pursuant to this [Underwriting] Agreement."  (Underwriting Agreement, Add. Ex. 1, ¶ 5.)  The evidence Stewart submitted in support of its summary judgment motion is simply insufficient to allow the Court to make such a ruling.

    ii. <u>There is an issue of fact as to how much of the $450,300 Stewart incurred due to Metro's negligence, fraud, or other intentional act.</u>

Finally, Stewart must show that the entire $450,300 was incurred "due to [Metro's] negligence, fraud, or other intentional act."  (Underwriting Agreement, Add. Ex. 1, ¶ 5(B).)  In addition to the fact that much or most of Stewart's losses were incurred dealing with Arnold's implied covenant claim, and not for diminution in value, the record shows that a significant portion of those losses were the direct result of Stewart's own negligent handling of the Arnold claim, not Metro's negligence.  As the record shows, on March 9, 1998, Stewart had the chance to resolve the entire Arnold matter for approximately $72,000, including $35,000 to compensate Arnold for property it would give the Loves to extinguish the easement and an estimated $37,000 for improvements to the property to segregate traffic using Love's property from traffic using Arnold's property.  (<u>See, e.g.</u>, Letter from Vince Rampton to Karen Storlie, March 9, 1998, Add. Ex. 31.)  Stewart, however, would not contribute more than $35,000.  (<u>See</u> Letter from Karen Storlie to Vince Rampton, February 17, 1998, Add. Ex. 32; Letter from Vince Rampton to Karen Storlie, March 17, 1998, Add. Ex. 33.)  Indeed, on March 17, 1998, Arnold's counsel informed

Stewart that Stewart's refusal to contribute the extra $37,000 was unreasonable and a ground for liability for bad faith refusal to settle.  (Add. Ex. 33.)

The record indicates that when Stewart rejected Arnold's settlement offer, Stewart had not even had an appraisal done of the diminution in value that would be caused if Love's easement claim prevailed.[11]  Thus, Stewart had no basis to even determine what the likely effect would be if Love prevailed in the Love-Arnold action, or what Stewart's own exposure was under the Arnold policy.  And, of course, Stewart did not even think to involve Metro in the settlement discussion, or ask whether Metro would have been willing to contribute some of the funds to finalize the settlement and resolve the matter.  Instead, Stewart unilaterally decided to keep fighting the Love claim in court.  And as a result, of course, Stewart allegedly ended up paying nearly $750,000.  There is no reason to force Metro to pay for Stewart's bad decisions.

Recognizing the unfairness of this potential situation, courts have developed rules to pre-vent one party from being responsible for another's negligence unless the party clearly agreed to do so.  As Stewart itself conceded in its memorandum, under Utah law a party may not be indemnified against its own negligence unless the language of the contract and the surrounding facts and circumstances provides a "'sufficiently clear and unequivocal expression of the parties' intent'" to indemnify against such losses.  (Stewart Mem. at 34 (quoting Russ v Woodside Homes, 905 P.2d 901, 905 (Utah App. 1995).)  Here, neither the Underwriting Agreement nor the surrounding facts and circumstances reveal an intent to require Metro to indemnify Stewart for losses resulting from Stewart's own negligence.  Instead, the Underwriting Agreement limits Metro's liability to losses "due to the negligence, fraud, or intentional act or omission of *COM-*

---

[11] The record reveals only two appraisals Stewart obtained on the Arnold property, one performed in March 1999 and another in March 2003.

*PANY or its employees, representatives, or agents.*"   (Underwriting Agreement, Add. Ex. 1, ¶ 5(B) (emphasis added).)  In other words, under the plain language of the Underwriting Agreement, the only losses for which Metro may be held liable are those losses due to Metro's <u>own</u> culpable conduct, or the conduct of Metro's employees, representatives, or agents -- *not* Stewart's failure to handle claims in a reasonably prudent and competent fashion.

Importantly, *Ms. Storlie admitted that Stewart Title is responsible for its own negligence*:

Q:     Would you agree with me that Stewart Title is responsible for its own negligence?

A:     Yes.

(Storlie Depo. at 148:8-10.)  Given that Stewart's own 30(b)(6) witness testified that Metro is not responsible for Stewart's negligence, it is difficult to imagine how Stewart can seek summary judgment against Metro.

Metro's proposed interpretation of paragraph 5(B) is further supported by Utah law governing negligence liability.  When a plaintiff brings a claim for damages suffered due to another's alleged negligence, the plaintiff's own fault must be taken into account, and the defendant is not liable for the portion of the loss allocated to the plaintiff.  <u>See</u> Utah Code Ann. § 78-27-38(3) ("[N]o defendant is liable to any person seeking recovery for any amount in excess of the proportion of fault attributed to that defendant under Section 78-27-39.").  Instead, a defendant is liable only for his proportionate share of the responsibility for that loss, i.e., only the losses that are "due to his own negligence."

Stewart has claimed elsewhere that fault cannot be apportioned for damages caused by a breach of contract.  Stewart's assertion, however, begs the question.  Before the Court can determine whether Metro even breached the Underwriting Agreement, the Court must first determine

what (if anything) the Underwriting Agreement required Metro to pay Stewart.  In this case, the Underwriting Agreement required Metro to indemnify Stewart only for certain losses, i.e., losses due to Metro's "negligence, fraud, or intentional act or omission."  In other words, Metro is not seeking to apportion liability for damages caused by its own breach of the contract.  Rather, by limiting Metro's duty to indemnify to those losses "due to [Metro's] negligence, fraud, or intentional act or omission," the Underwriting Agreement *itself* requires apportionment of Stewart's losses before determining what Metro owed Stewart under the contract, according to the principles that apply to negligence, fraud, and intentional acts or omissions.  Thus, the Underwriting Agreement plainly does not require Metro to pay for losses Stewart suffered as a result of Stewart's own negligent handling of the Arnold claim.

As noted above, Stewart refused an offer to settle the entire matter for only $72,000, even though Arnold was asking Stewart to approve the settlement and even though Stewart had not done an appraisal to determine what the likely diminution of value would be if the Love easement were found valid.  Further, Stewart did so entirely on its own, without involving Metro or telling Metro that Stewart would look to Metro to indemnify Stewart for losses incurred on the Arnold claim.   And, once again, Stewart's intransigence led to Stewart's incurring nearly $750,000 in losses.  A fact finder could rationally infer that a large part of these losses are attributable to Stewart, not to Metro.

Further, the evidence shows that a significant portion of the fault for Stewart's purported losses should be allocated to Salt Lake County and/or the County Recorder's Office for misfiling the deed that contained the alleged Love easement.  Stewart agrees:  On July 30, 1997, Stewart

had Arnold file a Notice of Claim with Salt Lake County, alleging that the County was negligent

in filing the easement deed:

> As noted, the title examination of the Salt Lake County Recorder's Office records failed to discover the easement.   The examination failed to show the easement *due to the failure of the Salt Lake County Recorder to properly abstract or index the Corrective Warranty Deed to my client's property*.

(Notice of Claim, Add. Ex. 36, at 1-2 (emphasis added).)   The Notice of Claim concluded that

"the damages incurred by Arnold Industries as a result of the recorder's negligent indexing or

abstracting are approximately $500,000." (Id. at 2.)   When the County denied the claim, Stewart

had Arnold file a lawsuit against the County, which was dismissed because Stewart and/or its

counsel had waited too long before filing the Notice.   (See Order on Defendant's Motion to

Dismiss, Add. Ex. 37.)

Ms. Storlie admitted in her deposition that she authorized the filing of the claim against

the County and that Stewart believed, *and continues to believe*, that the claim was well-founded.

(Storlie Depo., Add. Ex. 2, at 417:2 - 418:15.)   Thus, Stewart has admitted that the County was

negligent and that this negligence contributed to the ultimate loss on the claim.   Once again, un-

der both the Underwriting Agreement and Utah law, Metro is liable only for its own negligence,

not the negligence of others.   Therefore, fault must be apportioned to Salt Lake County as well.[12]

Because apportionment of losses is a question of fact that is not suitable for summary

judgment, see Steffensen v. Smith's Mgt. Corp., 862 P.2d 1342, 1348 (Utah 1993) (apportion-

---

[12] The Utah Supreme Court summarily concluded that the County's failure to properly abstract or index the deed had not deprived Arnold of notice of the easement, and that therefore Arnold had no claim against the County.   Arnold Indus. v. Love, 63 P.2d at 730 ¶ 35.   Once again, however, that finding was based in large part on the fact that the easement was in open and obvious use, but Metro cannot be charged with notice of that use, since industry practices counsel *against* site inspections.   Moreover, the determination in the Utah Supreme Court case is not binding on Metro because Metro was not made a party.

- 32 -

ment of fault is entrusted to jury), Stewart's summary judgment motion would have to be denied on this basis as well.[13]

        2.    <u>Stewart has not established that Metro is liable for the $287,132.61 Stewart purportedly incurred in attorney fees</u>.

            a.    <u>Stewart has not established the basis, necessity, or reasonableness of the claimed fees</u>.

Stewart has not established that its attorney fees were reasonable.  Indeed, Stewart has barely established its attorney fees at all.  As established in the preceding section, Stewart's say-so is not enough to hold Metro liable for the full amounts Stewart paid to settle Arnold's claims against it.  For similar reasons, Stewart's say-so is not enough to hold Metro liable for the full amount of attorney fees Stewart claims to have incurred as a result of those claims.

On this point, Utah law is absolutely clear:  "Even under an express indemnity agreement, 'an indemnitee may recover only those fees *reasonably incurred in defending the claim indemnified against . . . .*'"  <u>Pavoni v. Nielson</u>, 999 P.2d 595, 599 (Utah App. 2000) (quoting <u>James Constructors v. Salt Lake City Corp.</u>, 888 P.2d 665, 673 (Utah App. 1994)) (emphasis added).  Thus, in <u>Ringwood v. Foreign Auto Works</u>, 786 P.2d 1350, 1360-61 (Utah App. 1990), the Utah Court of Appeals affirmed the denial of attorney fees sought under an indemnity agreement where the plaintiff had failed to present evidence that the fees were reasonable.  The agreement required one party to indemnify the other "'from any and all claims of loss, ... including

---

[13] The doctrine of avoidable consequences and its twin, the doctrine of mitigation of damages, also support Metro's position that it cannot be held liable for losses that are attributable to Stewart's unreasonable handling of the Arnold claim.  The basic principle of these doctrines is that a plaintiff may not recover damages for injuries that he could easily and reasonably have avoided *even if the defendant has breached the contract*.  Thus, even where a defendant breaches a contract, the plaintiff has a duty to act reasonably to minimize the losses that result.  Given the importance of these principles, it would be unreasonable to contend that the Underwriting Agreement makes Metro liable for the losses that Stewart itself could have avoided by taking reasonable steps to resolves the Arnold matter.

attorneys' fees arising from claims made by [the claimant]."  Id. at 1360 (quoting indemnity agreement).  Before the trial court, the sole evidence supporting the attorney fee claim was the indemnitee's testimony that he had paid $6500 to defend against the plaintiff's claims.  Id.  The trial court denied the fee request, concluding that the indemnitee had presented no evidence "that the fees were reasonable or necessary, or the nature of the work done."  Id.  The appellate court affirmed, expressly rejecting the indemnitee's argument that such a showing was not required:

> We see no basis for distinguishing a request for attorney fees under an indemnity provision from a request under an attorney fee provision.  "***Attorney fees awarded pursuant to contract or statute are usually those found by the court to be 'reasonable,' unless the statute or contract provides otherwise***."  Furthermore, "[i]t is well established that to justify a finding of a reasonable attorney's fee, there must be evidence in support of that finding . . . .  ***It is beyond dispute that an evidentiary basis is a fundamental requirement for establishing an award of attorney fees***."  ***The trial court was, therefore, correct in denying the request because there was no showing the fees requested were reasonable***.

Id. at 1360-61 (citations omitted; first omissions added; second ellipses in original; emphasis added).

In James Constructors, the court held that in assessing an indemnitee's claim for indemnification of attorney fees, a court must assess the four "*Dixie State Bank*" factors that govern standard attorney fee claims:

1.    What legal work was actually performed?

2.    How much of the work performed was reasonably necessary to adequately prosecute the matter?

3.    Is the attorney's billing rate consistent with the rates customarily charged in the locality for similar services?

4.    Are there circumstances which require consideration of additional factors, including those listed in the Code of Professional Responsibility?

James Constructors, 888 P.2d at 670 (quoting Dixie State Bank v. Bracken, 764 P.2d 985, 990 (Utah 1988)).  The court also held that in the indemnity context, a court may also have to consider additional factors:  "In accordance with these guidelines, we hold that if the indemnity context presents 'circumstances which require consideration of additional factors,' then the trial court ought to consider any additional factors that might be relevant."  Id.  Further, the party seeking fees has the burden of establishing the basis for those fees.  See Pavoni, 999 P.2d at 599-600; see also Cottonwood Mall Co. v. Sine, 830 P.2d 266, 268 (Utah 1992) ("An award of attorney fees must be based on the evidence and supported by findings of fact."); Mann v. Reynolds, 46 F.3d 1055, 1062 (10th Cir. 1995) (it is the burden of party applying for attorney fees to establish the extent and reasonableness of the request supporting the claim with meticulous contemporary time records).

Just as in Ringwood, the only evidence submitted in support of Stewart's claim for fees is Ms. Storlie's bold, unsupported assertion that Stewart incurred a certain amount in fees.  (See Storlie Decl. ¶ 47.)  Stewart presents no evidence of what legal work was actually performed, whether the work was reasonably necessary, or what the billing rate was and whether it was reasonable.  Thus, just as in Ringwood, the complete lack of evidence to support Stewart's attorney fee request defeats Stewart's claim for fees.

   b. <u>There is a disputed issue of fact as to whether the claimed fees were incurred in "loss adjustment."</u>

Further, Stewart has not submitted evidence that its attorney fees were incurred in "loss adjustment."  Ms. Storlie testifies in her declaration that the $287,832.61 in fees were incurred "to defend Arnold and settle the claim."  (Storlie Decl. ¶ 47.)  Stewart incurred at least some of these fees in investigating and defending against Arnold's claim for interest, damages, and

attorney fees for Stewart's breach of the implied covenant of good faith and fair dealing.  (See, e.g., Storlie Depo., Add. Ex. 2, at 393:22 - 394:18, 395:4-19, 398:20 - 399:16., 572:15 - 573:12.) Yet Ms. Storlie has not explained what portion of the fees were incurred in relation to the implied covenant claim, and which fees were incurred in actual "loss adjustment."

A party seeking attorney fees must "set out the time and fees expended for (1) successful claims for which there may be an entitlement to attorney fees, (2) unsuccessful claims for which there would have been an entitlement to attorney fees had the claims been successful, and (3) claims for which there is no entitlement for attorney fees."  Cottonwood Mall Co., 830 P.2d at 269-70.  Stewart has failed to identify what fees were incurred in defending against Arnold's claims for diminution in value due to the Love easement and what fees were incurred in investigating and defending against Arnold's claims against Stewart for breach of the implied covenant of good faith and fair dealing.  Accordingly, the evidence is insufficient to enable the Court to award fees as a matter of law.

  c. There is a disputed issue of fact as to whether all of the claimed fees were incurred "due to [Metro's] negligence, fraud, or intentional act or omission."

Finally, as explained in Section I(B)(1)(b) above, the Underwriting Agreement limits Metro's duty to indemnify, rendering Metro liable only for losses "due to" Metro's own negligence, fraud, or intentional act or omission.  (See Underwriting Agreement ¶ 5(B).)  Metro is not liable for losses attributable to Stewart's own failure to handle the Arnold matter properly.  (See id.)  Once again, Stewart could have resolved the entire Arnold matter in March 1998 for about one-tenth of what Stewart ended up spending.  Obviously, if Stewart had settled the claim in March 1998, instead of litigating for another *six years*, Stewart's attorney fees would have been

far less than the $287,832.61 Stewart claims to have incurred.  Thus, it is reasonable to infer that a significant portion of Stewart's fees is attributable to Stewart's failure to settle, not to Metro's alleged negligence in issuing the Arnold policy.  Moreover, because Stewart has not submitted evidence showing what fees were incurred prior to March 1998 and what fees were incurred thereafter, it would be pure speculation for the Court to award Stewart <u>any</u> fees at this point, even if all of the other requirements for indemnity were met.  Accordingly, for this reason as well, the Court should deny Stewart's motion for summary judgment as it pertains to the $287,832.61 in attorney fees Stewart supposedly incurred in connection with the Arnold claim.

###        C.        Stewart's claim is barred by estoppel.

Further, Stewart's failure to inform Metro that Stewart considered Metro responsible for the Arnold claim until the claim was completely resolved estops Stewart from asserting such responsibility now.  Estoppel applies where the following three elements are met:  "(i) a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; (ii) reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act, or failure to act; and (iii) injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act."  <u>CECO Corp. v. Concrete Specialists</u>, 772 P.2d 967, 969-70 (Utah 1989); <u>see also Tiberi v. Cigna Corp.</u>, 89 F.3d 1423, 1429 (10th Cir. 1996).[14]  The requirements of equitable estoppel have been met.

First, Stewart clearly made statements inconsistent with its current claim for indemnity from Metro for losses incurred from the Arnold claim.  As explained above, Stewart sent Policy

---

[14] Moreover, equitable estoppel is a question of fact and is not ordinarily subject to summary judgment.  <u>See</u> <u>Tiberi v. Cigna Corp.</u>, 89 F.3d 1423, 1429, 1428 (10th Cir. 1996).

Loss Reports to Metro for years stating that the Arnold claim was not billable to Metro under the Underwriting Agreement. (<u>See</u> Policy Loss Reports, Add. Ex. 18; <u>see also</u> Storlie Depo. at 411:9 - 415:7.)   As Ms. Storlie explained in her deposition, when Stewart puts "NO" next to "BILLABLE" in the Policy Loss Report, Stewart means that the agent is not liable to Stewart under the Agreement. (<u>See</u> Storlie Depo., Add. Ex. 2, at 180:1-9.)  Now, however, Stewart is claiming that every dollar of the Arnold claim is billable to Metro.  This is obviously inconsistent with Stewart's earlier representations.

Second, the "reasonable action or inaction" element is met.  Because Stewart repeatedly told Metro that the Arnold claim was not billable, Metro took no action to effect the resolution of the Arnold-Love matter or the Stewart-Arnold matter.  This inaction was reasonable, of course, because Metro had no idea that Stewart would later be coming to Metro demanding repayment of the amounts Stewart decided to pay on the claim.

Third, Metro would clearly be prejudiced if Stewart were allowed to contradict or repudiate its representations in the Policy Loss Reports.  Had Metro been involved, Metro could have been involved in the Arnold matter from the very start.  Metro could have participated in settlement and litigation decisions and could have contributed to settling the case.  Once again, Stewart could have settled the case for $72,000 but refused to pay more than $35,000, and this refusal led to the loss increasing by a factor of ten.  Metro could have contributed to the settlement or taken other steps to protect itself.  Instead, Stewart left Metro in the dark.

Estoppel is an equitable doctrine, designed to avoid gross injustice.  Here, it would be a gross injustice to allow Stewart to recover $738,000+ from Metro now, when Stewart told Metro all along that the claim was not Metro's responsibility.  At the very least, the record is sufficient

to raise a genuine issue of fact as to whether estoppel applies.  Thus, even if Stewart had established a prima facie claim against Metro (which it clearly has not done), summary judgment still would be improper.

## II.  STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE FAR WEST BANK CLAIM (First Cause of Action).

Stewart is not entitled to summary judgment on its Far West Bank claim because Metro has already paid the $2500 that Stewart claims it is owed.  (See Copy of Check, Add. Ex. 6; Al Newman Decl., Add. Ex. 5, ¶ 2.)  Stewart asserts that the check was for a different claim, but Al Newman asserts that the check was written to cover the Far West Bank claim.  See id. This factual dispute renders summary judgment inappropriate.

Further, the only damages Stewart claims are for attorney fees, but the only evidence of those fees is Ms. Storlie's conclusory statement that $3,907.56 was spent on fees.  There is no evidence what the fees were spent on, or why.  As explained in Section I(B)(2)(a) above, the indemnitee's unsupported assertion that it paid a certain amount in attorney fees is not enough to support a claim, even if the fees were spent on an indemnifiable matter.  See Ringwood, 786 P.2d at 1360-61; James Constructors, 888 P.2d at 673 (Utah App. 1994).  Thus, the lack of evidence sufficient to support a judgment for Stewart also requires the denial of this aspect of Stewart's motion.

## III.  STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE RUBBER BALL PRODUCTIONS CLAIM (Second Cause of Action).

Issues of fact preclude Stewart from obtaining summary judgment on its Rubber Ball Products claim.  Stewart claims that Metro issued a policy of title insurance to Rubber Ball Pro-

ductions; however, the policy was only issued at the express direction of Stewart through its agent Arlen Taylor, and Mr. Taylor specifically acknowledged to Metro that it was not responsible for this claim because the policy was issued at Stewart's request.  (See Al Newman Decl., Add. Ex. 5, ¶¶ 3-5.)  Additionally, in its Policy Loss Reports, Stewart acknowledged and admitted that the loss for the Rubber Ball matter was not "billable" to Metro.  (See Storlie Depo., Add. Ex. 2, at 500:22 - 501:13; Rubber Ball Claim Policy Loss Report, Add. Ex. 7.)[15]  Stewart may not recover damages from Metro when Metro was following Stewart's direction at the time. Further, Stewart's claim would be barred by the doctrines of waiver and estoppel.  Due to the factual issues regarding the authorization of the Rubber Ball Products policy, Stewart is not entitled to summary judgment on this claim.

## IV.    STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE HOLLOW POINTE CLAIM (Third Cause of Action).

Stewart's Hollow Pointe LC claim also lacks merit because Metro did not issue the title policy under which the claim was made.  The Underwriting Agreement makes Metro liable only in case of a "loss under a title policy *issued pursuant to this Agreement*."  (Underwriting Agreement, Add. Ex. 1, ¶ 5(A).)  The Hollow Pointe Policy itself clearly shows that it was issued by Coalition Title Agency, not Metro.  (See Add. Ex. 8.)  Stewart asserts that Coalition was acting as Metro's agent, but the testimony Stewart cites says no such thing; instead, the deposition testimony shows only that Coalition and Metro referred customers to each other.  (See also Al

_____

[15] As explained above, the "NO" designation regarding whether the claim is "BILLABLE" means that in Stewart's view, the agent is not liable to Stewart under the Underwriting Agreement.  (See Storlie Depo., Add. Ex. 2, at 180:1-9.)

Newman Decl., Add. Ex. 5, ¶ 6.)  Stewart has not established as a matter of law that the policy issued to Hollow Pointe was issued "pursuant to" the *Metro* agreement.

Further, Stewart determined in its Policy Loss Reports and other documents that the alleged loss was not billable to Metro under the Underwriting Agreement.  (See Storlie Depo., Add. Ex. 2, at 386:22 - 388:8, 388:20 - 390:2; Hollow Pointe Claim Policy Loss Report, Add. Ex. 9; Change of Status Form, Add. Ex. 10.)  Stewart may not change its mind now.

Finally, the Hollow Pointe claim allegedly consists entirely of attorney fees, yet, as with Stewart's other claims, there is no evidence of the basis or reasonableness of the fees.  Summary judgment is inappropriate for this reason as well.

## V.   STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE FIRST WESTERN NATIONAL BANK CLAIM (Fourth Cause of Action).

### A.   Stewart has not established as a matter of law that Metro was negligent.

Stewart has presented no evidence that Metro was negligent, which the Underwriting Agreement requires for Metro to be liable for more than $2500.  Stewart asserts that its loss on the First Western claim was due to Metro's failure to discover an instrument affecting title, but as Metro explained in Section I(A)(1) above, this is not enough, in and of itself, to subject Metro to liability for more than $2500.  Further, Stewart's 30(b)(6) witness testified under oath that Stewart could not identify any documents that Metro purportedly missed in searching the records or issuing the First Western policy.  (See Storlie Depo., Add. Ex. 2, at 357:2 - 360:4, 383:1-20.)

### B.   Stewart has not established the basis or reasonableness of the fees it is seeking.

The First Western claim consists entirely of attorney fees -- $23,558.88 worth.  Yet, as with Stewart's other claims, Stewart has presented no evidence whatsoever of what the fees were

spent on, or for what purpose, or what the hourly rates were, or whether the fees were related to a claim under a title policy issued pursuant to the Underwriting Agreement, or whether the fees were reasonable.   Once again, <u>Ringwood</u> and <u>James Constructors</u> require an indemnitee to establish the basis and reasonableness of fees requested, even where the fees are sought pursuant to an indemnity contract.   <u>See</u> <u>Ringwood</u>, 786 P.2d at 1360-61; <u>James Constructors</u>, 888 P.2d at 673 (Utah App. 1994).  Stewart simply has not satisfied this requirement.

      **C.**     **Stewart has not established that the fees were "due to" Metro's alleged negligence.**

Stewart has admitted that the First Western claim includes $2,996.00 in fees Stewart voluntarily paid to the law firm of Lottner Rubin Fishman Brown & Saul, even though Stewart was not obligated to pay those fees.  (<u>See</u> Storlie Depo., Add. Ex. 2, at 375:19 - 377:19; Letter from John Holt to Michael Friedman, April 15, 2003, and related documents, Add. Ex. 13.) Stewart thus has not shown that the fees were attributable to Metro's negligence.  If Stewart wants to make payments it is not responsible for, that is Stewart's right, but it is simply ludicrous for Stewart to insist that Metro be liable for those payments.  Given the triable issues of fact concerning exactly what fees Stewart was really obligated to pay on the First Western claim, summary judgment would be inappropriate for this reason as well.

**VI.**     **STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE DRAPER LAND LIMITED PARTNERSHIP CLAIM (Sixth Cause of Action).[16]**

      **A.**     **Stewart has not established that Metro was negligent.**

Once again, Stewart has not shown as a matter of law that Metro was negligent.  Indeed, even if Stewart were correct that Metro was liable beyond $2500 for any undiscovered document

---

[16] Once again, the Fifth Cause of Action was the Arnold Industries claim, addressed in Section I.

affecting title, Stewart still would not be entitled to judgment, because there is a factual dispute over whether Metro failed to discover such a document.  Stewart insists that it did, but Al Newman testified in his declaration that the policy Metro issued showed all of the recorded interests.  (Al Newman Decl., Add. Ex. 5, ¶¶ 7-9.)  This issue is thus not proper for summary judgment.

**B.      Stewart has not established that the settlement was reasonable.**

Stewart has made no showing that it was actually liable on the Draper Land claim or that the settlement was reasonable.  Instead, Stewart merely submits evidence showing that the settlement was made.  This is not enough to support a judgment on an indemnity claim, for the reasons set forth in Section I(B)(1)(a) above.

**C.      Stewart's claim is barred by the doctrines of waiver, estoppel, payment, and accord and satisfaction, because Stewart accepted payment in full for the claim.**

As shown by Al Newman's testimony, Stewart accepted a $2500 payment from Metro in full settlement of the Draper Land claim.  (<u>See</u> Al Newman Decl., Add. Ex. 5, ¶ 8.)  Under Utah law, when a party accepts a payment in full satisfaction of a disputed claim, or a claim over an unliquidated amount, the doctrine of accord and satisfaction prevents the person from pursuing the original claim.  <u>See, e.g.</u>, <u>ProMax Dev't Corp. v. Raile</u>, 998 P.2d 254, 259 (Utah 2000). (Stewart may deny that it received full payment, but this would merely raise a disputed issue of fact that would have to be resolved in Metro's favor as the non-movant.)  Stewart thus cannot be granted judgment as a matter of law on the Draper Land claim.

## VII.   STEWART TITLE HAS NOT ESTABLISHED THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE DEAN CLARK CLAIM (Seventh Cause of Action).

Stewart's request for summary judgment on the Dean Clark/Intermountain Mortgage[17] claim (Seventh Claim for Relief) should be denied for largely the same reasons set forth in connection with the Arnold Industries matter.  Stewart asserts that Metro is liable for $89,500 on that claim merely because (1) Metro did not discover a railroad easement on the property, and (2) Stewart incurred a loss of $92,000 in appraisal costs and settlement costs, $2500 of which Metro repaid.  (See Stewart Mem. at p. 11, ¶¶ 60-62.)  Stewart presents no other evidence to support its claim.  Stewart's evidence, even if true, is nowhere near sufficient to compel judgment as a matter of law against Metro on that claim.

### A.   Stewart has not established that Metro was negligent.

As explained above in Section I(A), Metro is not obligated to indemnify Stewart for more than $2500 unless Stewart establishes that it suffered loss "due to [Metro's] negligence, fraud, or intentional act or omission."  (Underwriting Agreement, Add. Ex. 1, ¶ 5(B).)  The mere fact that a document was missed is not sufficient for liability; under the plain language of the "negligence" requirement, Stewart must show that Metro was actually negligent, i.e., that Metro failed to exercise due care in searching the records and/or issuing the Clark policy.[18]  At the very least, given the plain meaning of the word "negligence," the fact that the Underwriting Agreement must be narrowly construed as an indemnity contract, the fact that the Underwriting Agreement must be construed against Stewart as the drafter, and the fact that Metro is entitled to the benefit

---

[17]  The policy was issued to Clark, but the claim was made by his assignee, Intermountain Mortgage, Inc.  (See Stewart Mem. at 11-12.)

[18]  Once again, Stewart has conceded that it has no evidence that Metro committed fraud or another intentional act or omission.  (Storlie Depo. at 169-70, 174.)

of all reasonable inferences as the non-movant, it would be improper to conclude as a matter of law that Metro is liable in every instance where a document affecting title is missed, regardless of whether Metro was negligent or whether the failure was due to another cause.  Thus, Stewart cannot be granted judgment as a matter of law without showing that Metro was negligent, and Stewart's failure to make such a showing in connection with the Clark claim, as with the Arnold claim, dooms its motion.

**B.     Stewart has not established that Stewart was actually liable on the claim under the Clark policy and that the settlement was reasonable.**

Further, Stewart has made no showing that Stewart was actually liable on the Clark policy claim or that the settlement Stewart paid was reasonable.

The Clark title policy was a lender's policy of title insurance.  An underwriter has no liability on a lender's policy until the insured lender suffers a loss *due to* an insured defect.  Karl v. Commonwealth Land Title Ins. Co., 24 Cal. Rptr. 2d 912, 915-16 (App. 1993).  As Ms. Storlie described in her deposition:

> We didn't reserve [the Clark policy claim at the time Stewart first became aware of the railroad right-of-way] because we didn't know there was going to be a loss to the insured under the policy because of the railroad right-of-way. And maybe what would help clarify it is that a loss under a lender's policy is different than a loss under an owner's policy.  And a lender does not experience a loss until they foreclose.  And once they have foreclosed on the property and are not able to sell it for the amount they are due under their note and deed of trust ***because of a title defect***, then they could experience a loss.

(Storlie Depo., Add. Ex. 2, at 101 (emphasis added).)  Stewart had liability for the Clark policy claim *only if* the borrower ("Howcroft") did not pay the debt secured by the insured trust deed as promised and at the foreclosure sale Stewart's insured filed to recoup the debt ***because of*** the railroad right-of-way as opposed to any other reason.  It is undisputed that Howcroft did not pay

as promised, but Metro was not responsible for his failure to pay.  It is also undisputed that Stewart's insured did not recover the full amount of the debt at the foreclosure sale.  However, there is absolutely no evidence that the insured's inability to recover the full amount of its debt at the foreclosure sale was in any way due to the railroad right-of-way.

The "insured estate" identified in the Clark title policy consisted of two contiguous parcels both owned by Howcroft.  (See Clark Policy, Add. Ex. 20, at 1-2; Storlie Depo. at 122:14-22.)  Parcel 2 (the "Front Parcel") was part of a zoned subdivision.  (Storlie Depo. at 123:6-8.)  This Front Parcel had street access and sufficient frontage to meet city zoning requirements.  Howcroft's home was located on this Front Parcel.  (Al Newman Depo. at 28.)  Parcel 1 (the "Back Parcel") that was identified in the Clark title policy was contiguous with the back border of the Front Parcel.  The Back Parcel was not in any city subdivision and had the city's default agricultural zoning designation that did not permit a home to be built on this parcel. The Back Parcel had no street access other than by going over the Front Parcel as long as both parcels had common ownership as they did when the policy was issued.  (See Cook Appraisal, Add. Ex. 35, at 64-65; Storlie Depo. at 125:10-24.)  The railroad right-of-way encumbered the Back Parcel. (Holt Depo., Add. Ex. 25, at 22:14-24.)

At the time the Clark title policy was issued, Howcroft had three senior trust deeds encumbering the Front Parcel which were excluded from the Clark title policy.  (See Clark Policy, Add. Ex. 20, at 5-6).  Prior to the time that the trust deed insured by the Clark title policy was foreclosed, a foreclosure sale had been held on one of these senior trust deeds which wiped out any security Stewart's insured had in the Front Parcel.  (Storlie Depo., Add. Ex. 2, at 117:7-18.)  Thus, when the insured trust deed was foreclosed, only the Back Parcel was offered for sale

rather than the entire "insured estate" identified in the Clark title policy as consisting of both the Front Parcel and Back Parcel together.  (Storlie Depo. at 106:15-23.)   At the foreclosure sale Stewart's insured did not recover the full amount owed, not due to the railroad right-of-way, but because only a portion of the "insured estate" was offered for sale. The inability of Stewart's insured to offer the full "insured estate" at its foreclosure sale was in no way due to any "negligence, fraud or intentional act or omission" by Metro.

Perhaps of greater importance, at the time that Stewart's insured held its foreclosure sale, the property which it offered was only a worthless portion of the "insured estate."  The foreclosure of the Front Parcel by a senior lienholder destroyed the common ownership of the Front Parcel and the Back Parcel thereby rendering the Back Parcel landlocked, without access to any street.  At the time Stewart's insured foreclosed, all it could offer was an unzoned, landlocked parcel.  Stewart's insured failed to recover the amounts secured by its trust deed at the foreclosure sale, not because of the railroad right-of-way, but because it could only sell the worthless remnants of the "insured estate" left over after the valuable parcel had been foreclosed by an earlier sale.  The fact that Stewart's insured was able to offer at foreclosure sale only the landlocked Back Parcel was not due to any "negligence, fraud or intentional act or omission" by Metro, it was due to a previous foreclosure sale by a senior lien holder.

Stewart was aware of the senior lien holder's foreclosing the Front Parcel, wiping out Stewart's insured's interests in that parcel and that this would sever the common ownership of the two parcels that made up the "insured estate." (See Storlie Depo. at 112:1-6, 116-17.)  Stewart was also aware that when it's insured conducted its foreclosure sale it was "to foreclose its insured trust deed lien against the property describe as Parcel No. 1 [in the Clark title policy]."

(Letter from John T. Anderson to Holly Dahm, October 31, 2000, Add. Ex. 38.)  Significantly, following the foreclosure sale *when Stewart's insured made the claim on the Clark title policy it alleged its losses were due to an encumbrance completely unrelated to the railroad right-of-way*.  The claim was based on the insured's belief that the foreclosed property was subject to a senior trust deed held by Karl Bankowski.  The notice of claim read: "Because *the presence of the Bankowski lien as an encumbrance against the Property rendered the Property valueless* to my client, demand is hereby made for payment of the loss Intermountain Mortgage incurred under the Policy . . ."  (Letter from John T. Anderson to Stewart Title, February 28, 2001, Add. Ex. 19 (emphasis added).)

Stewart had actual knowledge that the claim against the Clark policy was not based upon the Railroad right-of-way and that significant factors which were in no way the fault of Metro profoundly affected the value of the foreclosed property at the time of the foreclosure sale.  In short, when its insured made the claim against the Clark Policy, Stewart had no evidence that its insured suffered *any* damage as a result of the railroad right-of-way and there was strong evidence that its insured's losses were caused by other factors.  However, Stewart failed to properly investigate the claim to determine if the railroad right-of-way caused any damage to its insured. This is critical because Stewart had no duty to pay any loss to its insured if the railroad right-of-way caused its insured no damages.  If Stewart had no obligation to pay a loss to its insured due to the railroad right-of-way, Stewart had no basis to demand payment from Metro.

Rather than investigating whether the railroad right-of-way caused its insured to suffer a loss at the foreclosure sale, Stewart negligently and capriciously proceeded to treat the Clark

policy claim as if the railroad right-of-way was the only possible cause of its insured's inability to recover the full amount of its debt at the sale.

Stewart responded to the Clark policy claim by ordering an appraisal to quantify the diminution in value to the insured estate caused by the railroad right-of-way. Under the terms of the title insurance policy issued as the basis of the Clark policy claim, the measure of Stewart's liability was "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance."  (Clark Policy, Add. Ex. 20, at p. 10, ¶ 7(a)(iii) of the Conditions and Stipulations portion of the policy.); <u>see also</u> Letter from John Holt to John T. Anderson, June 5, 2001, Add. Ex. 21 (Stewart's cover letter to its insured explaining its determination of liability and settlement offer).)  The "insured estate" as defined by the policy consisted of all of the Front Parcel and Back Parcel together.  (Storlie Depo. at 122:14-22.)  However, Stewart never obtained an appraisal to determine the value of the insured estate (that is, the entire Front Parcel and Back Parcel together) as insured (without the railroad right-of-way encumbering the Back Parcel) versus its value subject to the railroad right-of-way.  (Storlie Depo. at 113:22 - 114:2.)  Therefore, ***Stewart has no evidence that the railroad right-of-way diminished the value of the insured estate.***  If the railroad right-of-way did in fact diminish the value of the insured estate, Stewart is completely unable to quantify this loss. Stewart's Motion for Summary Judgment on the Clark policy claim must be denied on this basis alone.

Stewart ordered an incorrect appraisal to determine damages.  When Stewart ordered an appraisal purportedly to determine the damages allegedly suffered by it's insured, Stewart *did not* request an appraisal of the insured estate as insured and an appraisal of the insured estate subject

to the railroad right-of-way as required by the policy.  Rather, Stewart requested an appraisal of only the Back Parcel as if it were the entire insured estate and an independent, stand-alone lot. (See Letter from John Holt to Jonathan Cook, April 4, 2001, Add. Ex. 39; Holt Depo., Add. Ex. 25, at 18:3-23; Storlie Depo., Add. Ex. 2, at 127:6 - 128:24.)  Stewart is not entitled to summary judgment on the Clark policy claim because there are issues of fact regarding how much of Stewart's clamed damage was caused by Stewart's negligence in ordering an incorrect appraisal.

The appraisal from the Cook Group opined that the Back Parcel without the railroad right-of-way had a value of $100,000 and a value with the railroad right-of-way of $10,000. (See Cook Appraisal, Add. Ex. 35, at MNDC 0006.)  In valuing the Back Parcel without the railroad right-of-way the Cook Group made several significant assumptions.  It noted:  "The subject parcel does not have access from any paved road" and assumed that access could be had over the adjoining property (at no cost), even though there was no common ownership at the time.  (Id. at 65.)  The Cook Group represented that at the time of its appraisal the Back Parcel was "Unzoned," but assumed that absent the railroad right-of-way it could be rezoned RR-22 (without cost) and therefore, developed.  (Id. at 56.)  The Cook Group opined that the railroad right-of-way diminished the value of the Back Parcel by $90,000.

Stewart responded to the appraisal by the Cook Group by forwarding a check for $90,000 and a proposed settlement agreement to its insured.  (Storlie Depo, Add. Ex. 2, at 120:15 - 122:13; Letter from Holt to Anderson, Add. Ex. 21.)  Stewart paid its insured $90,000 solely based on the railroad right-of-way, and not because of any claim that there was any other encumbrance against the insured property.  (Storlie Depo. at 121:12-18.)

As with the Arnold claim, it is undisputed that Stewart did not notify Metro that it was considering paying Intermountain $90,000 to settle the claim and did not tender the defense of the claim to Metro prior to paying Intermountain.  (See Al Newman Decl., Add. Ex. 5, ¶¶ 12-15; see also Letter from Al Newman to John Holt, Nov. 19, 2001, Add. Ex. 34.)  Instead, Stewart unilaterally decided to pay the claim, and then demanded full reimbursement from Metro.  Further, as with the Arnold claim, Stewart did not even tell Metro that it considered the claim to be Metro's responsibility until after the claim was settled.  (Al Newman Decl., ¶¶  18; see also Al Newman Letter, Add. Ex. 34.)

As explained in Section I(B)(1)(a) above, equitable principles of indemnity do not allow a putative indemnitee to unilaterally settle a claim and then make the indemnitor foot the bill simply by showing the amount paid in settlement.  Instead, where the indemnitee pays a settlement without obtaining the indemnitee's approval or tendering the defense, the indemnitee settles at its own risk, and cannot recover from the indemnitor unless he shows that (1) he was actually liable to the claimant, and (2) the settlement amount was reasonable.  See, e.g., 42 C.J.S. Indemnity § 24 (1990) and the other authorities cited in Section I(A)(1)(a) above.  Stewart has not even bothered to make such a showing, which again requires the denial of this portion of its motion.

Further, even if Stewart had made such a showing, the motion would have to be denied, because there is evidence in the record that the amount Stewart paid to settle the claim was *not* reasonable.  As with the Arnold policy, Stewart's policy with Clark required Stewart to pay only the diminution in value caused by the existence of the railroad easement.  (Clark Policy, Add.

Ex. 20, ¶ 7(a)(iii) (limiting Stewart's liability under the policy to the difference between the value of the estate as insured and the estate as encumbered).)

Metro was not given a copy of the Clark Group appraisal until after Stewart had paid its insured $90,000. (Al Newman Decl., Add. Ex. 5, ¶¶ 19.)  Once Metro was given a copy of the appraisal, it quickly responded with a letter pointing out flaws and incorrect assumptions made in the appraisal.  (Add. Ex. 34.)  After Metro pointed these errors out to Stewart, Stewart immediately recognized that the Appraisal was erroneous.  In fact, District Manager Nancy Frandsen stated in an e-mail that "As Arlen and I discussed, it does seem that our appraiser based his assessment on an erroneous zoning criteria.  This property is not buildable without frontage, and a zoning variance to allow it is highly unlikely."  (E-mail from Nancy Frandsen to Denise Edwall, June 10, 2002, Add. Ex. 23, at STGC-001513.)  Stewart's personnel even considered bringing a claim against the appraiser.  (Holt Depo., Add. Ex. 25, at 45:6 - 47:6.)  Karen Storlie also admitted that if an appraisal erroneously overstates the diminution in value caused by an encumbrance, Stewart does *not* owe the overstated amount to the insured.  (Storlie Depo., Add. Ex. 2, at 162:21 - 163:8.)  Yet Stewart did not make a claim against the appraiser, demanding instead that Metro pay the losses that Stewart incurred in reliance on the faulty appraisal.

One of the reasons why the law demands that an indemnitor be given notice and an opportunity to be involved in a settlement or defense is to prevent situations like this:  Where the indemnitee, who utterly lacks incentive to minimize the amount paid out to a claimant, fails to make a critical, reasoned choice before paying out substantial sums of money.  The errors in the appraisal were obvious, but Stewart simply was not paying attention.  And, of course, under Stewart's overly broad interpretation of the Underwriting Agreement, there was no need for

Stewart to pay attention, since under Stewart's position, Metro is liable to Stewart for all overpayments Stewart makes to a claimant.

The record is simply insufficient to enable this Court to determine as a matter of law that Stewart was actually liable to Intermountain Mortgage for $90,000, or that the settlement was reasonable.  Accordingly, summary judgment is not appropriate.

**C.     Stewart has not established that the entire $92,000 Stewart incurred in con- nection with the Clark/Intermountain Mortgage claim was "due to" Metro's negligence.**

Finally, Stewart has not shown that all of the $92,000 Stewart incurred was due to Metro's own negligence, as opposed to being due to the negligence of Stewart or the appraiser, The Cook Group.  Once again, Stewart's showing is sparse, at best:

> As the result of the Intermountain claim and based on the Cook Appraisal, Stewart incurred a loss of $92,000 in appraisal costs paid to The Cook Group ($2,000) and in settlement costs paid to Intermountain ($90,000).

(Storlie Decl. ¶ 62.)  There is no evidence that all of these losses are due to Metro's alleged negligence in searching the records and/or issuing the policy.  Further, the evidence shows that a significant portion of Stewart's payment resulted from its own negligence, and the negligence of The Cook Group.  Stewart failed to investigate the claim to determine if its insured suffered any loss due to the railroad right-of-way as opposed to any other reason.  Stewart decided to pay Intermountain based on the Cook Appraisal, but that appraisal was fundamentally flawed as demonstrated above, which would have become apparent if Stewart had merely read it before deciding to pay $90,000 in reliance on it.  It is significant to note that when Stewart provided a copy of the appraisal to Metro after demanding reimbursement for the full $90,000 Stewart gave its insured, Metro quickly and carefully examined the appraisal and identified a number of

inaccuracies that had a dramatic impact on value.  Stewart's own people admitted these errors in the appraisal once they were pointed out by Metro.  There is no reason Stewart could not have discovered these problems with the appraisal had they reviewed it carefully prior to disbursing money.  It appears that Stewart was careless with this claim, at least in part because it simply expected to pass this expense on to Metro.

Once again, the Underwriting Agreement expressly limits Metro's duty to indemnify; Metro need only indemnify Stewart for losses that are due to <u>Metro</u>'s negligence.  Under the applicable version of the Utah statute governing allocation of responsibility for negligence, fault must be allocated to "any person who contributed to the alleged injury," and a defendant such as Metro is not liable beyond its proportionate fault.  Utah Code Ann. §§ 78-27-38(3), (4)(a) (2004).  Here, the negligence of both Stewart and The Cook Group plainly contributed to the losses Stewart purportedly incurred in connection with the Clark/Intermountain Mortgage claim.  Thus, the extent of Metro's indemnity liability, if any, cannot be determined as a matter of law.

## CONCLUSION

Stewart has failed to make a showing sufficient to compel entry of judgment in its favor as a matter of law.  Further, genuine issues of fact exist on every claim.  The motion should be denied in its entirety.

**DATED**:        October 27, 2006.

ANDERSON & KARRENBERG


/s/ Stephen P. Horvat_____
Thomas R. Karrenberg
Stephen P. Horvat
**Attorneys for Defendant**